HIBBARD *v.* BAKER.

1. WILLS—COMPETENCY OF TESTATOR—EVIDENCE—PREVIOUS ILLNESS.

On the question of the mental competency of a man 79 years of age to make a will, testimony respecting an illness 9 years before, during which he had delusions, but from which he fully recovered, is inadmissible.

2. SAME—EVIDENCE—SUFFICIENCY.

Evidence on a will contest as to testator's capacity examined, and *held*, insufficient to warrant a finding of testamentary incapacity.

3. SAME—EVIDENCE—OPINIONS.

Nonexpert witnesses should not be allowed to give their opin-

ions that a testator was mentally incompetent when they tes-
tify to no facts inconsistent with sanity.

Error to Kalamazoo; Adams, J.    Submitted April 11,
1905.    (Docket No. 47.)    Decided July 24, 1905.

Frank L. Hibbard presented for probate the last will and
testament of William Baker, deceased.    The will was
allowed in the probate court, and Fayette L. Baker ap-
pealed to the circuit court.    There was judgment at the
circuit for contestant, and proponent brings error.    Re-
versed.

*D. O. French*, for appellant.

*Osborn & Mills*, for appellee.

OSTRANDER, J.    An instrument purporting to be the
last will of William Baker is claimed by his son, Fayette L.
Baker, to be invalid, because the testator lacked mental com-
petency to make it, and because undue influence over him
was exercised by his wife, and by others aiding and assist-
ing her.    William Baker was a farmer.    He died February
27, 1903, at the age of 83 years.    He had had two chil-
dren—the son, Fayette, born in 1850, and a daughter who
died, leaving a daughter.    This granddaughter from her
infancy lived with decedent as his own child.    Fayette
remained at home until he was 25 years of age, working
the last four years for wages.    Thereafter, for 19 years,
he worked his father's farm on shares.    He had five chil-
dren, all born on his father's farm.    In 1893 Fayette sold
to his father his crops, personal property, and a house he
had built for himself on the farm, and in January, 1894,
removed to Idaho, where he has since resided.    There re-
mained on the farm then decedent, his wife, and the
granddaughter.    On April 25, 1897, decedent's wife died.
Fayette was at home during a part of the time his mother
was ill.    Thereafter decedent and the grandchild com-
posed the household until August 20, 1899, when she mar-

ried, and, with her husband, lived some seven miles distant from decedent. Having been informed of the approaching marriage of his granddaughter, decedent proposed marriage to an elderly and respectable lady of his acquaintance, living in Battle Creek, and she declined his offer. Later, after the granddaughter had married and gone away, decedent arranged with Mary Hibbard, a widow, who then lived in Augusta, who for 30 years had lived within a half mile of decedent, to go to his farm and act as housekeeper. She went to decedent's farm on the last day of August, 1899. Two days later, on Saturday, at the breakfast table, decedent proposed marriage, and brought up the subject again on the succeeding Tuesday, at which time Mrs. Hibbard agreed to marry him. On Friday, September 8th, they, together, visited a lawyer in Battle Creek, who had some acquaintance with Mrs. Hibbard, and none with decedent. Decedent informed the lawyer of the contemplated marriage, and that he wanted a deed of his farm made in such way that he should have control of it as long as he lived, and, if Mrs. Hibbard outlived him, the farm should become hers after his death; if he survived her, it should remain his. He was advised that such disposition could not be made before the marriage; that after marriage a deed to them as husband and wife could be made. He was further advised, upon his inquiry, that an antenuptial contract could be entered into, and one was prepared and executed, and left with the lawyer for safe-keeping. As drawn, this contract not only covers the ground stated, but contains also a promise on the part of Mrs. Hibbard to execute a will in favor of decedent, devising him all realty of which she might die seised for his life. On Sunday, September 17, 1899, the parties were married. The granddaughter was not invited to attend, nor was she present. She had not been married at her grandfather's house, nor did she invite him to her wedding. On September 20, 1899, decedent and his wife executed a deed of the farm to a third person, who on the same day executed a deed to decedent

and his wife as tenants by entireties, containing also the
words, "and to the survivor of them and his or her heirs,
forever." These deeds were both duly recorded. De-
cedent also on the same day made his last will, by the
terms of which, after directing payment of his debts, he
bequeathed to the five children of his son (naming them)
$900, to his granddaughter $100, and the residue of his es-
tate was bequeathed and devised to his wife. The value
of this residuary legacy does not appear. We infer from
all the facts appearing that it is of small value. Frank
L. Hibbard, a foster son of his wife, was named execu-
tor. His wife also executed her will in accordance with
the terms of the antenuptial agreement, making her
foster son her residuary legatee and devisee. At the date
of his last marriage, decedent was 79 and his wife 66 years
of age. Mrs. Hibbard-Baker owned a house and lot in
Augusta, to which, after decedent had sold off his personal
effects at auction, they removed in November, 1901. In
1890 decedent had an acute attack of sickness, the nature
of which does not appear, during which he was subject to
delusions. In the spring of 1902, delusions recurred and
continued at intervals until he died. The probate court,
in which the contest was instituted, admitted the will to
probate. Contestant appealed to the circuit court, where
a jury found a general verdict against its validity. The
substance of all the testimony given in the circuit court is
in the bill of exceptions.

Counsel for proponent strongly insists that there is no
evidence of the mental incompetency of decedent at the
time the will was executed, and that the court should
have, as it was requested to do, so instructed the jury.
Determination of this contention has required the reading
of the entire record. Most of the testimony introduced to
show mental incompetency is aimed at establishing, by
possible inference, senile dementia—a progressive condi-
tion attendant in some cases upon advancing age, and a
condition which, if existing, affords opportunity for the
exercise of influence by way of direction and suggestion,

which does not attend, to such degree, at least, most forms of dementia. In other words, if decedent was afflicted as it is claimed he was, no test can well be applied to determine lucidity and disposing power at any particular time or during any particular interval. It may well be said, and our examination of the record convinces us that it should be said, that, if decedent was competent to make the disposition of his property which he did make, no separate question of undue influence is involved. There is no direct testimony and none from which it can be reasonably inferred, that decedent was improperly influenced or persuaded to make the disposition he did make, if he was legally competent to make a will. We have reached the conclusion that there is no evidence in this record impeaching the validity of this will. In reaching this conclusion, we eliminate entirely, as improperly admitted, the testimony received over objection relative to the illness decedent had in 1890. It is true that the testimony relating to this sickness shows that decedent had delusions. It also shows an acute malady, from which he recovered. It is undisputed that after that time he attended to his business as usual. He visited the World's Fair in 1893, made visits to New York and Boston in 1891, and sold land. He was more feeble physically.

The persons best acquainted with decedent to the time when the will was made were his son and his granddaughter. They are most concerned about the disposition of his property. It is true that the son (contestant) left the farm, and did not afterwards see very much of his father. He left the place in January, 1894.

"When my father was in his prime, he was not overly large in stature, but he was a very strong, wiry man, with great endurance, physically and mentally. He was a man that had a great deal of will power, and a strong mind of his own—very—as near as I can describe it. I went away from there before mother died.

"Q. Will you state to the jury how you came to go west?

"A. Well, I had lived there until I was forty-five years

old. I had my own family of five children, and I could see that my father's condition was getting in such shape there was nothing certain about my having a home there. It would be just as he happened to take a notion. He was getting very feeble and feeble-minded, and I had made up my mind that I would talk with him, and see if he was willing to fix things so that I would be sure that I would have a home when he was through with it; and consequently I asked him and mother down one afternoon to my house, and talked the matter over.

" Q. What did you say to them ?

" A. Well, I told them that I had come to the conclusion, under the circumstances, that I could not stay there, the way I had, unless I knew I was going to have a home of my own when they were through with it.

" Q. What were you getting for working the farm ?

" A. One-half. I found half, and he found the other half, and each got half the profits.

" Q. Go on and tell the conversation you had in the presence of your father and mother.

" A. Well, pa spoke right up, and he says: ' I shan't fix things any different than they are. I am not going to deed my property away,' he says, ' until I am through with it.' Well I says, ' Why, don't misunderstand me.' I says, ' I don't want you to give me a cent, any more than you have ever given—not a cent.' I says, ' As far as your deeding your property away, I would advise you never to do that until you are through with it.' But I says, ' You can fix it so I can be sure that I will have a home here when you are through with it, and still you control your property just exactly the same.' And he said he wouldn't fix things any different than they was. He said, if I wanted to stay and work the place, he would like to have me, the same as I had, but, if I thought I could do any better, why, to go somewhere else.

"Q. Well, what did you do then?

"A. Well, I said—He said he wouldn't do anything different, and I told him, of course, if that is the way he thought about it, I was sorry about it, but, if that was the way he thought about it, that he could look for somebody else to work his place, for I should leave between that time and April.

" Q. Well, did you talk with him about it afterwards—about going away, and where to go to ?

"A. Yes, sir; I know I asked him one time what his

141 MICH.—9.

advice would be in regard to going North or going West. I thought some of going North. He said, if he was going away from here, he would go either West or South. I said, 'If you were going West or South, which would you advise?' He said, 'I should think I would go West.'"

On cross-examination, he testified:

"I didn't think him incompetent from the fact that he refused to deed the place to me. At the time he wasn't very bad off; that is, he wasn't like he became afterwards. He was in his seventies, and competent to do business; but he wasn't like he had been. I say he was getting so he wasn't able to do business. I thought he was at that time competent to make such a deal as that.

"*Q.* That was a very important matter, was it not?

"*A.* Well, it might have been. I had no talk with my father before that about conveying this property to me. Not a word. I never heard a deed mentioned before.

"*Q.* Well, he was positive in his determination that you could not have it, wasn't he?

"*A.* Yes. I told him that I could not stay there any longer, not to make any more; with the family I had on my hands, I could not afford to stay there any longer. He said: 'If you think you can do any better, why, go somewhere else. That is all right.' That conversation ended right there. Then we talked about where I had better go. I asked his advice in regard to going North or West. He said, if he was going to pass an opinion, if he was going away from there, he would either go South or West, and, if he was going to advise me, he would advise me never to go North. Then I went West."

After the marriage of the granddaughter, this witness wrote his father a letter upon the subject. It was written the day of his father's marriage, from which it is apparent that he knew that Mrs. Hibbard was at the house with him.

"BOISE, IDAHO, Sept. 17, 1899.

"*Dear Father:* * * * Addie wrote to Carrie to know what your plans were but she has not written us a word since she was married. Have been thinking we would hear from her. We were more than surprised to hear of her marriage as it was so much different from what she

talked when I was at home two years ago. She told me she would not get married as long as you lived, but would stay and keep house for you. Of course, we can't blame her for wanting to get married, but knowing the circumstances just as I do, I don't think she has done as she should. Now, I don't want to hurt her feelings or any one else's, but I think just as I have written.  *  *  * Now, pa, I wish you would write me and let me know what your plans are. Of course we could see by Carrie's wedding card that she was going to live with Abbott, as her P. O. address would be Galesburg. Now, we would all like to have you come out here and live with us, or come and stay just as long as you want to. Now, don't think the trip would be too much for you, for I believe you could take a palace car or tourist car and come just a little easier than you could stay at home, and I do think the change of water and climate would be a good thing for your bladder and kidney trouble, and we have probably got twenty or twenty-five just as good doctors in Boise as there is in any place. Have you got a good trusty man on your place? Now, I wish you would make your arrangements and come here this fall. You talk with Dr. Fisher about it and see what he thinks and I wish you would let us hear from you soon. If you think you can't write, perhaps Mrs. Hibbard would write for you or Mary McKeown would write for you. Now, don't fail to write.  *  *  *  Give Mrs. Hibbard our best respects and get her to write for you if you cannot see to write, and write as soon as you get this. Give our regards to all inquiring friends. They all say, 'Tell grandpa to come out here.'"

The granddaughter married in August, 1899, and left her grandfather alone in his house. She informed him in March of her intended marriage.

"There wasn't much said. I simply told him that I expected to be married in August, and would leave there, and he made no objections to it. I don't remember what his remark was, but not very much of anything. I don't remember that he himself referred to it again before August came round. I told him where I was going to. It was about seven miles from where he lived. I asked him to come and make his home with me. I gave him the chance.

"Q. What did he say about it?

"*A.* He said he would rather not. That is all the remark he made to that at that time."

On her cross-examination she gives us some details:

"I was born thirty-five years ago last March—1869. My mother died when I was a year and a half old. My grandparents then took me to their home, and cared for me through childhood and in womanhood. I made my home there all the while. I attended the district school, and from the district school to the high school at Kalamazoo. When I got through my schooling, I went back there to live. My grandfather had been a very prominent man in that township. He had held public offices. He was school director once, but I can't tell the date now. I can't tell whether he was director when he was taken sick in 1890, or not. I assisted him in looking after the details of the office; assisting him in writing, in his school records. At that time his hand trembled considerably.

"*Q.* And having been to school and educated in his home, he sometimes relied upon you to do more or less; to do the clerical part of his office work?

"*A.* I did all the writing.

"*Q.* He didn't ask you to do it because he was incompetent, did he?

"*A.* He didn't tell me why.

"*Q.* Well, can you tell us why?

"*A.* How can I tell, when he didn't tell me?

"*Q.* Did you know when the last term of his office of school director which he held expired?

"*A.* If he held it in 1890, it was in 1891.

"*Q.* Don't you remember of helping him take the census of the school district?

"*A.* I do, but not the year.

"*Q.* Was it before or after his sickness?

"*A.* It was afterwards. At the time of his sickness, Fayette was working the farm. He continued to work it until 1894. I suppose Fayette turned over to my grandfather after 1890 all the business, the same as he had before, but I don't know about that. I didn't watch his business while he was there as I did afterwards.

"*Q.* You didn't know much about his business then, at all, after the time that Fayette went away, in 1894?

"*A.* Why, I knew something about it, of course. I suppose that my grandpa had a bank where he did his banking business. I don't remember so much about

that at that time. I tell you I wasn't paying attention to his business then, as I did afterwards. I suppose he had money in the bank. I know sometimes he had money here in the bank in Kalamazoo, but don't know whether it was before or after that.

"*Q.* Did he usually do his business at a bank in Battle Creek?

"*A.* I don't think he did as much business there' at that time as he did after 1894. It was his custom to take care of his money by banking it. When he had more than he wanted to use at home, it went to the bank.

"*Q.* In 1891 did your grandpa go anywhere?

"*A.* Yes, sir. He went on a trip to Boston and the East. He went also to Saratoga and New York. I think he was gone seven weeks. I don't remember any trips that he took in 1892.

"*Q.* Do you know of his loaning any money in 1892 or '3?

"*A.* I couldn't tell for sure any particular place that he did, but he loaned money; yes, sir. He had been in the habit right along of loaning money, and taking securities for it.

"*Q.* In 1893 did your grandfather go anywhere?

"*A.* He went to Chicago, to the World's Fair; he was there six days there at the time.

"*Q.* Up to that time Fayette and his father had had some little trouble, as I understand it?

"*A.* A little; yes. Things came up that they didn't agree on, but it was not constant wrangling. There was no jealousy on my part as to who should get the farm. I don't know whether there was on Fayette's part or not. He didn't tell me so.

"*Q.* Wasn't Fayette induced to have his father put the farm in his name so that he could not leave it to you?

"*A.* Not that I knew of. I had no talk with Fayette about that farm transaction. I did not know of his calling my grandparents down to talk that matter over with them until afterwards. Grandmother afterwards told me. My grandpa didn't tell me. He didn't say anything to me about it at all. When Fayette went away he and grandpa had some little disagreement about settling up, but not a great deal. Fayette wanted to sell the farm property. He wanted my grandfather to buy it.

"*Q.* Fayette put the price on his property, and your grandfather thought the price was too much?

" *A.* Yes; he thought he was rather high.

" *Q.* Did you and your grandmother talk with your grandfather to try and get him to settle with Fayette?

" *A.* Why, we told him we would settle rather than to have any trouble. We advised grandpa to settle.

" *Q.* And he refused to do it, didn't he?

" *A.* He said at first he would not, for the reason I said before—he thought Fayette was too high, he thought Fayette asked too much money for what he had.  *  *  *

" *Q.* In the settlement, how much did your grandfather pay him, all told?

" *A.* He was to receive $800. My grandfather paid him $500, and my grandmother $300.

" *Q.* How did your grandmother come to pay him $300?

" *A.* Because she simply did it. That is all I know about it. Grandpa asked her if she did not think she ought to pay half for buying the old house. I don't know it to be a fact that grandpa absolutely refused to pay $600 for the old house. The matter of the settlement was talked over among us all. We helped him go over the details of it, and all that, but not to aid him in getting a settlement, and my grandmother and grandfather each paid.

" *Q.* Now, after Fayette went away, in the spring of that year, your grandfather had an auction?

" *A.* Yes. That was in March. At that auction he sold his implements and stock on the farm that he didn't wish to keep.

" *Q.* He sold substantially all that he had bought of Fayette, didn't he?

" *A.* No; I couldn't say what amount of it.

" *Q.* Was it a fact that he was just buying that to help Fayette out?

" *A.* Why, I can't say that was the reason, particularly. I think George Brooks was the auction clerk. My grandfather took some notes at the auction. I don't know how many. I couldn't say.

" *Q.* Can you tell how many hundred dollars he took in notes?

" *A.* No; I couldn't say that. I don't know how much the auction amounted to in the aggregate.

" *Q.* Do you remember whether he lost any notes that he took?

" *A.* No; he didn't lose any. They were all paid—interest and all.

" *Q.* Do you know where your grandpa took his money

that he got from the auction—whether he put it in the bank or not?

"*A.* Why, I suppose he did. I can't say whether he took it to Battle Creek or Kalamazoo. That spring he made a lease with John Steve to work the farm. He was there two years, I think. That would be from the spring of 1894 until the spring of 1896. He had a written lease. I wrote it up. I had no form to draw the lease from, excepting the beginning of the legal form. He advised with me about it.

" *Q.* But he had to determine whether he should make a lease to Mr. Steve?

"*A.* Why, yes; I suppose he did. Yes, Mr. Steve was a good tenant. I considered him so.

" *Q.* Then he had judgment at that time to make a lease and select a good tenant, didn't he?

"*A.* Well, he turned out to be a good tenant. The lease was in writing. It was a lease on shares, half and half. Mr. Steve worked the place, and turned over to my grandpa what his share of the crops was. That was the lease.

" *Q.* Now, did your grandpa go anywhere in the summer of 1894?

"*A.* Yes, he went to Saratoga county again. He took another trip to New York. We were gone four or five weeks this time. As near as I can remember, that was the second trip he had taken East.

" *Q.* Who decided as to the taking of that trip?

" *A.* I could not say as any person did, but my grandfather decided whether he would take it or not.

" *Q.* Now, did your grandfather sell any timber or any land in 1894?

"*A.* He sold some land, but don't want to swear to the date of it. He sold it to Manning and Cash Greer. I can't tell the exact amount of it—forty acres, I think. It was timbered land. I think he got $600 for the land, but I am not sure. The timber had been cut off the land. He sold the timber to Wm. Frie. I think he sold the timber within a year before. I can't tell what he got for the timber. In selling the land, he didn't get all the money down. I don't remember how much he got.

" *Q.* In this trip in 1891, did your grandfather keep a record of the expenses of the trip?

"*A.* I didn't see him. I don't know whether he did or not, but I suppose he did.

" *Q.* I show you this memorandum book, marked 'Exhibit K,' and ask you whose writing it is on the first two pages?

"*A.* It looks like Mr. Baker's. If I should read it over, I should say it referred to that trip—what I see of it.

" *Q.* 'September 19th, 1901. From Battle Creek to Boston $57.00.'

"*A.* That is in grandpa's handwriting.

" *Q.* 'From Boston to Fundy, $16.14.'

"*A.* We went to Fundy, in the State of New York. From Fundy we went to Northville. We all went—my grandmother and grandfather and myself.

" *Q.* 'From Fundy to Augusta, $42.94. Total $142.04.' He kept track of that, didn't he?

"*A.* He kept track of that. It looks that way. My grandfather paid the expenses of the trip, but my part of it and my grandmother's part of it was paid back to him. That came out of my grandmother's money. My grandmother had some property of her own. She did not take it out of my inheritance which she left me when she died. This was the trip in 1891. I do not know what the next trip cost. I don't remember. The next trip was to Saratoga county, New York.

" *Q.* Now, I want to come back to the deal we were talking about; that piece of land; that forty-acre business your grandfather has sold to Manning & Greer; and you said, if I remember correctly, that he had sold the timber off of it previous to that?

"*A.* Yes, sir; I think he sold the timber off the land the year before he sold the land. When he gave the deed of the property, there were present Mrs. Baker, his wife, myself, Mr. Manning, Mr. Greer, and Mr. Slawson. I don't remember how much money was paid down. Something was paid. He took a note and mortgage to secure the balance of it. It was paid him in payments, but I could not tell in just what amounts, nor do I know how much he got for the timber which he sold off the year before. This mortgage and note was one of the papers that he had to look after. I can't tell how long it run before it was finally settled up. Either Mr. Manning or Mr. Greer came to the house to make payments along. I don't remember whether it was yearly payments or not. That transaction had not been closed up when I was married and went away. They were making payments to him along during the time that I was there. This trans-

action was had after Fayette went away. That would be some time after January, 1894.

"*Q.* Did he sell any other land at any other time?

"*A.* Yes; he sold some more. He sold the timber off the five acres of the home farm. That was located on the south side of the road. I do not remember what he got for it. He sold the timber standing in the tree. It had not been cut. He sold this to Wm. Frie. That was when Mr. McKewan was there working the place. I think Mr. McKewan was there from 1898 to 1899—I think, the year he sold the timber. Mr. Bolyen came in the spring of 1899. He was the next tenant. I don't know how much he got for it. I don't remember. He didn't sell the tops, but just the saw timber."

Other witnesses relate a few instances of apparent lapses of memory, of appearances of faulty co-ordination of ideas, and stories of advancing feebleness as age increased, during the period from 1890 to the date of his death. No witness testifies to facts, conversations, or appearances which are fairly indicative of unsound mentality. The last 30 years of his life, decedent was troubled with a difficulty of the bladder, resulting from an enlarged prostate. Inflammation would sometimes become acute, and he required help to use the catheter. Otherwise he had no considerable ailment after 1890 until his last illness, in 1903. As has been noticed, in August, 1899, the granddaughter was married—not at home, but in Augusta, and decedent was not invited to be present. The day after the marriage she came to her grandfather's house with men and horses and wagons, and took away household property which she says her grandmother had given to her; leaving the house pretty well stripped of furniture, and leaving the old gentleman alone. It is true that she testifies to his uniform good nature towards her thereafter, and we notice the fact only to emphasize the other fact that decedent was confronted with a condition probably never anticipated, and was left to meet it as best he could. He sought in marriage an elderly and respectable widow, living in Battle Creek, who declined to marry him. His intentions in this direction became known to others than

the parties most directly interested. It was known to Mrs. Hibbard, and she first learned from him after she had gone to his house that he was not to marry the woman referred to. At his age, and afflicted with the infirmity already referred to, decedent required assistance which a wife could best render. He proposed marriage, not to a stranger, but to a woman upwards of 60 years of age, whom he had known well for 30 years. Evidently he realized, and sensibly, the situation. He told her that, if she would marry him, she should have the farm. What occurred thereafter has been already rehearsed. There is in the record nothing impeaching the integrity or good faith of Mrs. Hibbard, her son, nor the lawyer who prepared the papers. There is no testimony tending to show any lack of attention to decedent after the marriage. The will and other papers were prepared by a lawyer who did not know decedent, but who did know Frank Hibbard and Mrs. Hibbard. He was suggested by Frank Hibbard. But nothing could be more natural. The testimony of this lawyer is to the effect that decedent stated his business, was intelligent, and talked connectedly and with apparent understanding of his business, property, and heirs at law, and remembered the names of his children and grandchildren, and that nothing indicated that he was not entirely competent to do the business he was there to do. It is undisputed that the decedent did his own business—and it was considerable—received, paid out, and put in bank his money, and was in all respects the master of his own affairs, until a period shortly before his death. He had the infirmities of old age, but it did not appear that any one at any time assumed to act for him in any business affair, or that he ever lacked mental capacity to make the numerous bargains which he did make. No instance of a lack of capacity or of a want of business shrewdness is pointed out.

The witness Manning was asked this question:

"Q. You may state whether the last time you saw him,

in your judgment, he was capable to understand and do ordinary business?"

Objection that witness had not testified to any facts inconsistent with a perfectly well and sound mental condition. Objection was overruled, and witness answered: "I don't think he was." This witness had testified to the purchase from decedent in 1894 of a 40-acre timber lot. When he made the bargain he—

"Observed he was getting older. He wasn't the man he formerly was. He was not as active. His mind did not seem to be as clear as it was in former years when I knew him. I afterwards went there occasionally to do business with him, and I noticed that he seemed to be forgetful, and his mind was not as good as it was at first. When I went there to deal with him about this timber, I did the business partly with Mr. Baker and partly with Miss Palmeter. We all talked about it—Mr. Baker, Mrs. Baker, and Miss Palmeter. * * * Mr. Baker did part of it, and Miss Palmeter did part of it. He appeared to me at the time to be forgetful. * * * He didn't appear to be able to negotiate with me without prompting. His mind appeared to me to be different then from what it had been when I had known him before. When I went away from there you would ask him anything, and his answer was usually right back for you to decide; but at the time I saw him, and after that when I went there to transact business with him, he seemed to hesitate more about answering questions, and to rely more upon Miss Palmeter and his wife. * * * He was, of course, getting old. * * * His hearing was not good. He would generally ask over, unless a person spoke loud to him. His eyesight was not good. He had a magnifying glass that he used when he was trying to read any printed matter or any writing. * * * About three or possibly four months after his second marriage I was there and did some papering for him. I noticed at that time that he was getting old and feeble. * * * I noticed nothing special as to his mental condition. I talked with him very little, but not much. I didn't notice any difference in his hearing."

On cross-examination the witness testified that he had no business transaction with decedent before 1894, and

from that year up to 1900 lived on a farm two miles from him; that prior to 1894 he had remarked in decedent a strong will and mind; that in the purchase made in 1894 another (a justice of the peace) made the papers, but Mr. Baker made the price.

"*Q.* Now, what did you see of him that made you think he was not capable of doing business?

"*A.* Well, from his general appearance, as anybody would naturally be; that he was getting older and in a more feeble condition; and his calling on his wife and Miss Palmeter to bring up things that he had forgotten about. I don't remember now that it was anything, except I know that every little while he would refer something to them for an answer. I was there from twenty minutes to half an hour, and it might have been longer.

"*Q.* Did you see anything about his general appearance, besides his being old?

"*A.* Why, just as I said—that he called on them to answer a part of the questions. I cannot tell just what questions he did call on them to answer. I don't remember the questions. My memory is reasonably good. I can't say a single thing that he asked them to answer. He advised with them as to whether he had better sell it or not. There was nothing strange about his advising with his wife concerning the sale of this land, but, from what I have known of Mr. Baker before that, he decided these matters himself. I was never present when he decided an important business transaction before, and I can't say that he didn't always advise with his wife in business. That was the first time that I was ever present with Mr. Baker to have any business transaction with him or any important engagement, and at that time he advised with his wife as to whether he should sell that piece of land that he was about to sell. I cannot give you any other reason why I believe that Mr. Baker was then incompetent to do business. What I have said covers it. I should not have done any business with him, had I known that he was fully incompetent to do business. The next business I did with him was when I went back to have the papers executed, about a week or ten days after I went there to talk it over. Mr. Slawson executed the deed, and his wife joined him. I paid down $50. I think Miss Palmeter took the money and counted it. Mr. Baker took a mortgage back for the balance of the purchase price. The rea-

son I handed the money to Miss Palmeter was that she came and took the money, instead of him. We were all together in the room. I was there about a year after that. I think then I paid him $100, and he indorsed it on the note. Miss Palmeter simply did the indorsing.

" Q. Did you see anything of Mr. Baker that day that impressed you that he was not fit to do business ?

" A. Well, the fact that he didn't do any of it. I did not do any business that day except to leave the money and have it indorsed. I had no long talk with Mr. Baker. Nothing occurred that day by which I was able to gauge his mental condition, only just from the fact that she did the business for him. There was nothing said, as I remember it now, that indicated that he was incompetent or in failing mind or health, any more than he left the whole business for her to do. There was no business done, except to take the money and indorse it on the note. His eyesight was somewhat dim. I presume he could not probably read very well. There was nothing in that transaction that indicated incompetency. The next time I saw him I think was the vinegar transaction. When I went there, the fact that he didn't know me went to show that he was gradually losing his mind or his eyesight—I don't know, but perhaps both. I know that his eyesight was not good. I think this vinegar transaction happened in the spring of 1896, and, all there was about it, he didn't recognize me. I presume I talked with him something like five minutes. He said he didn't believe he could sell me any vinegar, and that was all there was to it. The next time I saw Mr. Baker was when I went to make the last payment. This was in 1897. Mrs. Baker and Miss Palmeter were both there. I paid all I owed at that time. Mr. Greer wasn't there at that time. Mr. Baker didn't at that time discharge the mortgage, because Mr. Greer had not at that time paid his all up. I finished my part at that time on the mortgage. My half of it was paid. Nothing special attracted my attention at that time, except that he was failing. He was getting older. He was two years older. Besides the fact that he was getting older I noticed nothing especially. The next time I was there I went over to hang some paper. That was about four months after he was married. I was there about four hours, I presume; something like that. Nothing happened especially that day, only the general business of hanging the paper. We did that and got away as soon as we could.

I didn't have any business transaction that day; not a bit. I had a casual conversation with him. That was all. Nothing took place that day to make me think that Mr. Baker was not competent to do business, only the general appearance. He was a little older. I think he was a little hard of hearing the last time I saw him, in the fore part of 1900, and when I bought the timber of him in 1894.

" *Q.* Have you told all the reasons you can give here why you said Mr. Baker was mentally incompetent, in your judgment?

" *A.* I think so."

Counsel moved to strike out the opinion answer given by this witness. The ruling was refused. Another witness for contestant, in the course of his cross-examination, said, in substance, that he thought, upon an occasion stated, that decedent acted sort of crazy. It was said in *Prentis* v. *Bates,* 93 Mich. 234 (17 L. R. A. 494), in a discussion of a ruling similar to the one here criticised:

" It may be a question of some difficulty to determine in all cases whether a witness has shown himself competent, nor do we intimate that he may not be able to state to the jury his opinion, after showing that there were acts and appearances of the party which he is unable to describe to the jury, but which left an impression upon his mind; but in the absence of this, and where the testimony of the witness only goes the length of showing acts which are entirely consistent with sanity, and which have not the slightest tendency to show insanity, it would be a dangerous rule which would permit his opinion to be received."

Applying this rule here—and we are obliged to consider the errors assigned which require it—we think that the opinion of Manning ought not to have been received. It is proper to state also that if each witness presented and examined by contestant had been asked for an opinion touching the mental competency of decedent, and the same test had been applied, the opinion must have been excluded.

It will not be profitable to further discuss the testimony. Our conclusion is reached, not in an attempt to find the

facts as upon disputed testimony, but it is based upon the finding that there is in the record no testimony of facts, acts, or conditions inconsistent with the mental competency of decedent at or before the time of executing the will. The conclusion reached makes discussion of other errors assigned unnecessary.

The judgment below is reversed, with costs of this court to proponent, and a new trial granted.

MOORE, C. J., and CARPENTER, McALVAY, and HOOKER, JJ., concurred.