## *In re* DU BOIS' ESTATE.

1. EVIDENCE—WILLS—OPINION EVIDENCE.

An opinion of a witness, on the trial of the question of mental competency to execute a will, that the testator understood what he was doing at the time of executing his will, was admissible, whether or not he had testified to facts and circumstances sufficient to admit his opinion as to the mental competency of deceased.

2. SAME—TRIAL—CONCLUSIONS.

A question framed as follows: "State whether or not the stories (narrated by testator) were reasonable, connected stories," was not open to the objection that it was leading, but was properly excluded, since it called for the conclusion of the witness.

3. SAME—MEDICAL AUTHORITIES.

On cross-examination of a medical expert, the trial court rightly refused to permit counsel to read extracts from a medical work, and to ask the opinion of witness concerning it.

4. SAME—COMPETENCY—EXPERT AND OPINION EVIDENCE.

After the court had refused to permit a witness to answer a question concerning testator's mental competency, counsel asked whether or not testator was able to transact ordinary business matters, and witness answered the first question, excluded by the court, testifying that the deceased was sane and competent to make a will. No motion was made to strike out the answer: *Held* that the question was admissible, the answer being objectionable as not responsive and incompetent, but no error was committed in failing to strike it out, in the absence of a motion.

5. WILLS—UNDUE INFLUENCE.

Undue influence may be proved by other than direct testimony that it has been exerted; and circumstances disclosed by the will itself and the manner of procuring it to be made may raise the presumption that undue influence has been exerted.

6. SAME.

But where no such circumstances were disclosed by the evidence, the question was properly withdrawn from the consideration of the jury.

7. Appeal and Error—Trial—Argument.

 On a record showing only detached portions of argument to which exception was taken in the trial court, and which the court rebuked, where the record did not disclose whether or not the improper argument was called out by remarks of opposing counsel, prejudicial error was not shown.

Error to Tuscola; Beach, J. Submitted October 25, 1910. (Docket No. 112.) Decided December 22, 1910.

Samuel R. Du Bois and Frank North offered for probate the will of Isaac Du Bois, deceased. From an order of the probate court admitting the instrument to probate, George H. Du Bois and Mary E. Lewis, contestants, appealed to the circuit court. A judgment sustaining the validity of the will is reviewed by contestants on writ of error. Affirmed.

*W. J. Spears, Harry G. Kimball,* and *Ellwood P. Morey,* for appellants.

*Frank L. Fales,* for appellees.

Ostrander, J. The probate court for the county of Tuscola admitted to probate an instrument proposed as the last will and testament of Isaac Du Bois, deceased. The contestants appealed to the circuit court, contending that deceased had not sufficient testamentary capacity to make the will, and that he was unduly influenced by relatives and those surrounding him at the time the will was made. A jury found that the instrument was the last will of the deceased, and contestants ask us to review the proceedings had at the trial. The errors assigned will be considered in the order in which they are presented in the brief for appellants.

1. One of the subscribing witnesses to the will was sworn and examined as a witness. He was asked:

"*Q.* From what you observed and discerned of Mr. Du Bois at the time he requested you to sign this as an attesting witness, in his presence, this will, did you form any

conclusion as to whether he understood and comprehended the will?

"*A.* I paid no further attention any more than I would to any other customer that I was waiting on in the bank.

"*Q.* I do not ask you to tell the conclusion, but did you arrive at any conclusion as to whether Mr. Du Bois understood and comprehended this particular will? (An objection was made to this question by counsel for contestants, on the ground that it is not a proper question and on the ground that witness had not laid sufficient foundation, which said objection was overruled by the court. Contestants excepted.)

"*A.* I should think he fully understood what he was doing.

"*Q.* From what you observed and discerned, state whether or not the testator, Mr. Du Bois, appeared to be under any restraint or undue influence?

"*A.* Not to my knowledge."

It will be noticed that the question called for no opinion or conclusion, and could, and should, have been answered by yes or no. Assuming that the objection raises the question which is argued in the brief, namely, that the witness had not testified to such observation of the testator or to such acts or circumstances as entitled him to express an opinion concerning his mental competency, it is still apparent that the answer to the question imported no less and no more than the signature of the same witness to the will imported, which was that so far as appearances were noticed by the witness the testator appeared to understand what he was doing at the time of executing the will which the witness attested.

2. A witness for the contestants had testified that the deceased, in August, 1906, was under his observation, and that he noticed, among other things, that he told long stories. Upon this subject the examination proceeded as follows:

"*Q.* Can you give us any idea of those stories, what would he say?

"*A.* All of his early life; talked a great deal of his pony, told us his hunting trips and fishing, and how he lived while in the woods.

"*Q.* State whether or not the stories were reasonable, connected stories ?"

Counsel for proponents objécted upon the ground that the question was leading, and the objection was sustained. The argument which is made for appellants is that a witness may often state a conclusion or give an impression when he is unable to describe appearances. We see nothing in the question which would indicate that the witness was expected to answer the question in a particular way. The question was objectionable as calling for the conclusion of the witness. While this was not the ground of the objection, it appears to have been the ground of the ruling. Later, the witness was denied the privilege of answering the question, " Did they have a point to them ?" referring to the stories, and the question, " Were these reasonable stories ?" the court saying that those were questions for the jury. Still later, the witness attempted to describe the stories. The ruling of the court was correct, and the jury had the benefit of the description of the stories which the witness gave, and of the testimony tending to prove that the stories were frequently repeated. They also had the benefit of the opinion of other witnesses for contestants who testified, without objection, that decedent told long stories, without point, not reasonable or connected, repeating them without apparent reason.

3. A medical witness, called by the proponents, testified upon direct examination as follows:

"*Q.* Do people ever die of arterio sclerosis standing by itself, except they have either apoplexy or an attack of the heart?

"*A.* Not in my experience.

"*Q.* Do you know of any instance laid down in the authorities, except it is one or the other of the causes named that would immediately precede death ?

"*A.* I do not.

"*Q.* Are there any authorities, with which you are familiar, that lay it down that death may ensue from that disease, except one or the other of these immediate causes obtain ?

"*A.* No.

"*Q.* State whether you know in your own experience, or know of any instance laid down in the authorities, of a person dying of arterio sclerosis or inanition due to that, where the capacity to transact ordinary business is questioned, for a period of two months prior to the death?

"*A.* No, I don't."

On cross-examination, he testified as follows:

"*Q.* Does that have an effect on the mentality of the patient?

"*A.* Arterio sclerosis?

"*Q.* Yes.

"*A.* I never heard of a case where it did.

"*Q.* Is Church & Peterson a good work on this?

"*A.* On what?

"*Q.* Church & Peterson on Nervous and Mental Diseases?

"*A.* Supposed to be.

"*Q.* A standard authority?

"*A.* It is one of them. I don't know how late an edition you have got there; it might have been an authority a number of years ago, and not authority now. It would be well enough to know the edition.

"*Q.* Church & Peterson, 1903.

"*A.* That is quite recent.

"*Q.* Is that a good authority on it?

"*A.* I should say so.

"*Q.* Do you know whether it has any effect on cerebral activity?

"*A.* Well, it will after a while, undoubtedly.

"*Q.* On page 197 of Church & Peterson it says (reading from book).

"*Mr. Wixson:* We object to reading from the medical book and substituting the text of some writer for the testimony of the witness, even upon cross-examination. We have no opportunity for redirect examination upon this authority. (Objection sustained. * * * Exception for contestants.)"

It is conceded by counsel for appellants that scientific books cannot be introduced in evidence, but contended that it is competent on cross-examination to base questions upon the contents of them or upon extracts from them, so long as the testimony is rigidly confined to the one pur-

pose of testing the competency of the expert, or the value of his opinions. Assuming the rule to be as stated, we are not convinced that counsel was denied the benefit of it. We do not know what counsel proposed to read, or did read. The point is not ruled in appellants' favor by *Pinney* v. *Cahill*, 48 Mich. 584 (12 N. W. 862), because the witness had not referred to the medical work as supporting his opinion, or professed any acquaintance with the work beyond its general reputation. We find no reason for refusing to apply the rule of *Marshall* v. *Brown*, 50 Mich. 148 (15 N. W. 55).

4. The same witness, on redirect examination, was asked:

"*Q.* Can you answer now, predicating your answer upon what you saw of him from the 20th of October to the 9th of November including the intervening visits, as to whether from your first visit on October 20th to November 9th the last, he had the capacity to make a will?

"*Mr. Kimball:* Same objection.

"*The Court:* The objection is sustained to the latter portion of the question.

"*Mr. Wixson:* What particular portion, if the court please, if you will direct my attention to it?

"*The Court:* Under your own objections haven't we confined it to the question of the will in question in this case?

"*Mr. Wixson:* If the court please, I think the 134th Michigan decided that we are not obliged to confine it to the will in this case. My objections to the testimony of the contestants—perhaps the court and counsel misunderstood one another—was as to the question involving what would constitute legal testamentary capacity. Now, I don't ask the doctor here as to his knowledge—without reference to what may or may not constitute capacity—I ask him predicating it solely upon what he observed upon these several visits. I cite the 134th Michigan, page 51.

"*The Court:* He may answer.

"*Q.* Predicating your answer solely upon what you observed of Isaac Du Bois on the occasion of your first visit, the last visit, and the intermediate visits, between those dates, did you, or could you now, have an opinion as

to the capacity of Mr. Du Bois to transact and handle his ordinary business affairs? (Same objection. Objection overruled. Exception for contestants.)

"*A.* Yes; I have an opinion.

"*Q.* What is that opinion?

"*A.* That he was perfectly sane and competent to make a will."

It will be noticed that the witness did not answer the question over which the colloquy occurred. The question he did answer was not subject to the same objection, and the ruling permitting an answer was not erroneous. The answer given was subject to the objection, on the part of proponents, that it was not responsive, and, on the part of the contestants, that it was really an answer to the question first put and subject to the objection which was debated. But no motion was made to strike it out.

5. At the close of the testimony, the court withdrew from the jury the question of undue influence, and this is assigned as error. The examination of the record which this assignment makes necessary has been made. The will was executed October 23, 1906. The testator died December 12, 1906, at the age of 62 years. He left no widow and no children; his kindred being three brothers, a sister, and the two children of a deceased brother. The sister lived in Washington, D. C., one brother at Vassar, Mich., two brothers in California, and the nephews in Maine and New York, respectively. The legatees and respective bequests made are: To George, his brother, $1,000; to Charles, his brother, $3,000; to Mary, his sister, $2,000; to Edward, nephew, $1,000; to Nettie, widow of John, $1,000; to Matilda, wife of his brother, Samuel R., $3,000. Samuel R. is made residuary legatee. It seems to be conceded that of the property immediately disposed of by the will the residuary legatee would take very much the largest portion. These provisions, and the one for payment of debts, etc., are found in the first eight numbered paragraphs of the will. In the ninth paragraph is a recital of decedent's interest, as legatee, in an estate in

Missouri, "which will be paid at intervals and in different amounts for a term of twenty years from the date of such will." Such sums as shall, after his death, be derived from this source the testator gives to Frank North, in trust, to hold and invest until the said 20 years shall have elapsed and the Missouri estate is closed, then to distribute, after paying taxes and expenses, to his brothers and sisters living at the time of the distribution, share and share alike, and if any are dead leaving descendants living at that time, such descendants to take the portion which would otherwise have been distributed to the ancestor.

Frank North, who is appointed executor and trustee, is cashier of, and a considerable stockholder in, a bank at Vassar. The lawyer who drew the will is the attorney of the bank and a personal friend of said North. Decedent formerly lived in and around Vassar, then at some point in the northern part of Michigan, then in Wisconsin, where he was a homesteader and where he lived alone. In 1904 he went to Hastings, Mich., where his brother Charles then resided, living with his brother, and from there to Vassar in February, 1905, to the home of his brother Samuel R. Du Bois, and lived with him the remainder of his life, some 22 months.

Notice of the bequest of a portion of the Missouri estate seems to have been received in May, 1905. With money from that source decedent purchased a farm of 100 acres, erected some buildings thereon, and placed it in charge of an agent. The necessary inference from the testimony is that decedent had accumulated very little property, had very little education derived from schools and books, was addicted to the intemperate use of liquor, which intemperate use increased with prosperity. That his intemperance frequently made him incapable of transacting business, and had an effect upon his general condition which hastened his death, are facts which may be said to be established by the testimony. The certificate given at his death stated the cause of death to be "inanition due to arterio sclerosis." To what extent his mental and physical capacity

had been affected at the time the will was made is the subject of much of the testimony presented to the jury. Some facts are established. He went Medina, N. Y., and to Washington, D. C., visiting, in February, 1906, remaining until about April 1st. In September, 1906, he attended the fair in Toronto, Canada, and on his return, after a day's absence in Saginaw, he attended the State fair in Detroit. There is much conflicting testimony, professional and other, concerning his physical condition in October, 1906, and thereafter. He applied to Frank North to draw his will and was referred to Mr. Fales, who did draw it, and, according to his testimony, it was drawn to express what testator desired to have expressed therein. The circumstances were presented to the jury.

We do not find any testimony which tends to prove the act, or fact, of solicitation of the decedent, or argument or persuasion, to make a will containing the provisions found in this one. Considering that each of his brothers and his sister profited equally with himself out of the Missouri estate, none of the provisions of the will clearly offend what is sometimes called natural justice or feeling. Undoubtedly, undue influence may be proved by other than direct testimony that it has been exerted, and circumstances disclosed by the will itself and the manner of procuring it to be made may raise the presumption that undue influence has been exerted. *In re McMaster's Estate*, 163 Mich. 210 (128 N. W. 259). Although it is contended by the appellants that the residuary legatee, the trustee and the lawyer who prepared the will were interested, each in a different way, in the preparation of such a will, it is not claimed that the interest and relations disclosed, and the will itself, give rise to the presumption referred to. It may be said here, as it was said in *Hibbard* v. *Baker*, 141 Mich. 124, 128 (104 N. W. 399), that if decedent was competent to make the will, there is involved no distinct question of undue influence. The court did not err in the ruling complained about.

6. Upon the question of the mental competency of the

decedent the verdict of the jury was taken. Upon this subject the charge is not criticised.

7. The portions of the arguments of counsel for the proponents which appear in the record evidence a trial somewhat bitterly contested. The practice of sending to this court in the bill of exceptions single and detached statements made by counsel in argument is not calculated, generally, to materially aid the court in determining whether the consequences should be a reversal of the judgment. Though such a penalty is sometimes imposed upon the client for misbehavior of counsel, it is for conduct prejudicial to the defeated party, not excused or palliated by the conduct or statements of counsel upon the other side, and not evidence merely of bad taste. Upon this record it appears that counsel for proponents improperly characterized the contestants and their counsel, and was rebuked by the court. We are not satisfied that contestants were prejudiced by the statements, since a jury is quite as likely to resent as to applaud unfair reasoning and vituperation.

The judgment is affirmed.

Bird, C. J., and Hooker, Moore, and Stone, JJ., concurred.