*In re* HEWITT'S ESTATE.

ANDERSON *v.* KENDRICK.

1. APPEAL AND ERROR—DIRECTED VERDICT—REVIEW.

In determining whether error was committed in the direction of a verdict the testimony of the adverse party must be considered in its most favorable aspect.

2. WILLS—INSANE DELUSIONS—MENTAL COMPETENCY—EVIDENCE—QUESTION FOR JURY.

In a will contest, *held,* that there was sufficient proof of the lack of mental capacity and of insane delusions on the part of testatrix to warrant submission of such questions to the jury.

3. SAME—UNDUE INFLUENCE—MENTAL COMPETENCY—EVIDENCE—QUESTION FOR JURY.

Evidence that testatrix, a woman 80 years of age, was in a confused state of mind while at a hospital, that the relations between her and a niece had been cordial previously to the time she was removed from the hospital by proponent, that she made a will while at the hospital giving the niece some of her property, that she was removed from the hospital by proponent and her husband and placed in charge of another physician, that another will was shortly afterwards made giving proponent nearly all of her property, that the niece and friends of testatrix were not allowed to see her, that the day before the will was made an attorney had refused to draw the will because of the condition of testatrix, and that while at the home of proponent testatrix said that the niece was a dissolute woman, was sufficient to make the question of undue influence in making the later will one for the jury.

4. SAME—INSTRUCTIONS—MENTAL COMPETENCY.

An instruction, that all that is necessary to show that a person is mentally competent to make a will is "that the person making the will, at the time of making the will, shall have such mental faculties and the control of same to the extent of recalling the nature and extent of her property, the number and names of her relatives, the

natural objects of her bounty, and the power to retain such facts while considering her will," was proper.[1]

5. SAME.

A requested instruction that no unfavorable inferences should be drawn from the failure of the husband of proponent to testify was properly refused, where the husband was charged as being a party in influencing the testatrix in making a new will in favor of his wife, and he was present at many of the conversations with deceased, knew all about her condition, got possession of her personal effects, and was present during the trial of the case.

6. APPEAL AND ERROR—INSTRUCTIONS—REQUESTS TO CHARGE.

It is not error to refuse instructions covered by the main charge.

Error to Jackson; Parkinson, J. Submitted October 4, 1917. (Docket No. 10.) Decided December 27, 1917.

Ella J. Anderson presented for probate the alleged last will and testament of Rose Hewitt, deceased. The will was contested by Sarah Kendrick and others on the ground of undue influence and fraud. The will was disallowed in the probate court and proponent appealed to the circuit court. Judgment for contestants. Proponent brings error. Affirmed.

*Price & Whiting*, for appellant.

*Miner & Reece* (*W. S. Cobb*, of counsel), for appellees.

KUHN, C. J. Rose Hewitt died in the city of Jackson on January 27, 1911. The record does not disclose her exact age, but it does appear that she was upwards of 80 years of age. She had lived alone for many years, and was a widow during the last 30 years

[1] For authorities discussing the question as to what is testamentary capacity, see notes in 27 L. R. A. (N. S.) 5; L. R. A. 1915A, 444.

199—Mich.—16.

of her life. Her estate consisted of a lot on which stood two frame houses, in one of which she had lived. She also had some money in the bank, amounting to about $3,270, and also some cash, $500 of which was found in her house and removed therefrom before her death.

The will in question was executed on the 20th day of January, 1911, at a time when Mrs. Hewitt was in a boarding house, to which she had been removed from the City Hospital by George Anderson and his wife, who are charged, with others, with procuring the will by undue influence and fraud at a time when testatrix was too weak, physically and mentally, to transact the business. The will, which was offered for probate, practically gives all of her property to Mrs. Anderson.

When the will was offered for probate, Sarah Kendrick and her three sisters, Mary Kendrick, Annie Neal, and Julia Morresen, nieces of the deceased, and their cousin, James Finnegan, interposed objections, and contested its probate on the ground of the mental incompetency of the deceased; also that the deceased had been unduly influenced to execute the will by Mr. and Mrs. Anderson and J. C. Kugler, a physician in attendance, and that the deceased was possessed of an insane delusion in regard to Sarah Kendrick. The will was denied probate by the judge of probate, and upon appeal these issues were tried before a jury in the circuit court. At the close of the testimony the proponent moved that the court direct a verdict in her favor on the ground, substantially, that there was no evidence introduced to sustain any of the claims of the contestants; that is, that the testatrix was mentally incompetent, that there had been any undue influence exercised upon her with reference to the execution of this will, or that she was possessed of an insane delusion which affected the instrument in question. The motion was denied by the trial judge, and

the three issues were submitted to the jury, who found, as the probate judge had previously found, that the paper offered was not the last will of Mrs. Hewitt.

The question argued at great length in the brief of counsel for the appellant and also at the oral argument is that there was not sufficient testimony to go to the jury upon the questions of incompetency, undue influence, and insane delusions, and that the court erred in not directing a verdict in favor of proponent, as requested. This question has made necessary a critical examination of the entire record, and it is impossible within the purview of a written opinion to attempt to review all the testimony upon the questions here in issue. Such, however, will be referred to as we think necessary to understand the questions involved. In approaching this discussion it should be borne in mind, however, that the testimony must be considered in the light most favorable to the contestants' claim.

Sarah Kendrick, the niece, did not reside in the city of Jackson, but it is her claim that she had been to see her aunt on various occasions, and came to Jackson on the 23d of December, 1910, at the solicitation of her aunt. At that time she stopped at her sister's and the home of a friend named Maggie Fallon, where she was taken sick with bronchitis, and after she recovered from this, on or about the 5th day of January, 1911, she went to the home of her aunt, and found that she also was sick, and saw a doctor, and after some discussion took her to the City Hospital at Jackson for treatment.

We think that the testimony is quite conclusive that Mrs. Hewitt was an eccentric person, and appeared especially to be so with reference to her property matters. When she was taken to the hospital, her niece wanted her to place her money and bank book in the hospital safe, but this she refused to do, and turned

them over to her niece to keep. Neither would she allow the nurses to bathe her, and insisted upon the niece remaining in the hospital with her, but which it was found impracticable for the niece to do, and it is her claim that she called every day until she was again taken ill.

While in the hospital, on January 9th, an attorney by the name of Curtis was called to prepare a will. He found that the deceased was possessed with an idea that her niece had taken $500 of her money, and that therefore she would only give her $100. in the will. It appears from the testimony of Mr. Curtis that she was in a confused state of mind concerning the amount of money she had and seemed unable to distinguish between half a hundred and half a thousand, and when he explained to her that there was $50 in gold in her purse which she had in her possession she stated to him that her niece therefore had not taken the money, and that she would give her $1,000. The will was drawn, and made such a provision, and also gave the house and lot to her nephew, Edward Finnegan, and $100 to a boy she claimed she had brought up, and the remainder of the property went to certain local charitable institutions.

It is the claim of the contestant Sarah Kendrick that she was taken ill on January 12th, and therefore could not visit the hospital, and that on the following day Mrs. Anderson visited the deceased, and, without consulting the hospital authorities or any of deceased's relatives, called in her own physician, Dr. Kugler, and arranged to remove Mrs. Hewitt from the hospital to her husband's boarding house, which, it is Mrs. Anderson's claim, was done at the urgent request of the deceased, on the 16th of January. It is the claim of the contestants that from that time on the attitude of Mrs. Hewitt changed entirely, and that she thereafter refused to have anything to do with her niece,

and it is their claim that the Andersons refused to permit her old friends to see her, that Miss Fallon, whom deceased had requested while at the hospital to call on her, was refused admission, and likewise Mrs. Seaman, an old friend who had written letters for her, testified that she was not allowed to see her when she called at the Anderson house.

On the 19th of January, Mr. Anderson called upon Mr. Noon, an attorney of the city of Jackson, to come to his home to draw some papers for Mrs. Hewitt. Mr. Noon testified that Anderson told him Mrs. Hewitt had several thousand dollars in the bank, and said:

"What kind of a paper can be drawn up or what can be done so the money can be turned over to us or so the old lady can obtain it?"

—that he was called into the sick room, and there found Mrs. Hewitt in such a physical condition that he refused to draw any papers. He described her condition and appearance to be:

"She looked very small. Her face was naturally small, and she looked very ill and sallow, and the face gave evidence of physical distress. She looked like a dying person. That's about the only way I can say it, Mr. Reece. I guess I was about three or four feet from her, as close as that. I am sure she did not know of my presence there. She didn't say a word to me. I was not introduced to her. Nobody said anything to her about my being there."

—and that he told Mr. Anderson that her condition was such that he would not draft any papers, and that Mr. Anderson replied, "She is in very bad shape," or, "She is very bad." The next day Dr. Kugler again came to his office and requested him again to go to the Anderson house and draw some papers, and Mr. Noon thereupon refused to go. Dr. Kugler thereupon called another attorney, a Mr. Rossman, and when he arrived at the house, Mr. Anderson told him that he thought Mrs. Hewitt wanted to make a will—

"and I think she wants to give some of her property to us or to Mrs. Anderson—I don't know whether she does or not. She hasn't any relatives, only one niece, who keeps coming here, and she don't want her to come here."

Mr. Rossman testified that Mrs. Hewitt, in referring to her niece, said:

"I have got a niece that keeps coming here, and I don't want her to come here. She is a bad woman. She runs all over—travels all over. She don't care anything for me, except for my money. She wouldn't do anything for me. It is my money all she wants. She wouldn't clothe my little finger"

—and further that she told him that the niece had stolen money from her. It appears that Mr. Rossman thereupon drew the will in question, and witnesses to the will were called by the Andersons. One of the witnesses, Mr. Woodworth, testified that he did not think that the deceased was capable of taking into account her property, considering the names and conditions of her relatives, and carrying this in her mind long enough to dictate a will. He further testified:

"Mr. Rossman put the pen in the old lady's hand. She was very much emaciated. She could not write her name.

"*Q.* She could not?

"*A.* No.

"*Q.* Mr. Rossman then said, without being requested by her and without her saying a word, 'I will write it for you'?

"*A.* Yes, sir.

"*Q.* And took the pen out of her hand and proceeded to write her name?

"*A.* Yes.

"*Q.* Then, after he had got through with that, he said, 'I will make your mark and you put your finger on the end of the pen'?

"*A.* Yes, sir.

"*Q.* He didn't ask her to make her mark or attempt to?

"*A.* No.

"*Q.* When he took the pen out of her hand, she gave it up without any protest or remark whatever?

"*A.* Yes.

"*Q.* When he told her to put her finger on the pen, did she do that without saying a word?

"*A.* Yes, sir.

"*Q.* During the whole time you were in there, the only thing that old woman said in relation to the execution of that will was when he read it over and got through reading it and asked her if that was as she wanted it, she said 'Yes'?

"*A.* Yes.

"*Q.* That was the only utterance that old woman made in relation to that will?

"*A.* Yes, sir.

"*Q.* You were not introduced to her when you went in there?

"*A.* No, sir.

"*Q.* So far as you know, she didn't know who you were?

"*A.* I don't think she did.

"*Q.* And no explanation made as to why you were there?

"*A.* No, sir; I think I have told all that was said there in relation to the will; nothing further said by Rossman than what has been stated.

"*Q.* He didn't say, did he, 'Mrs. Hewitt, you acknowledge this to be your last will and testament and ask these people to sign it as witnesses,' or anything of that sort?

"*A.* No; he had her sanction the will as he read it.

"*Q.* He only read it once to her and she only sanctioned it after he got through reading it all?

"*A.* Spoke low or talked low; nodded her head several times, I think."

It also appears that Mr. Rossman, at his own suggestion, was made a co-executor with Dr. Kugler of the will.

Mrs. Patterson, the nurse who attended Mrs. Hewitt at the Anderson house, testified that Mrs. Hewitt stated to her that her niece was a harlot and was try-

ing to obtain possession of her house for the purpose of prostitution, and that she should never get it, and that the niece had taken her to the hospital against her will, and had stolen $500 from her, and therefore she did not wish to leave her anything.

Accepting the testimony of the contestants as true, it appears that before she went to the hospital, and while there, Mrs. Hewitt was interested in a very friendly way in her niece, the principal contestant in this case. That Mrs. Hewitt was in a confused and uncertain state of mind while at the hospital is evidenced by the fact that when Mr. Curtis, the lawyer, drew the will on the 9th of January, she conceived the notion that her niece had taken some of her money, and after Mr. Curtis had explained to her the difference between a half a hundred and a half a thousand, she apparently was satisfied, and made a substantial bequest to her niece in that will. We think it is plain that there was testimony to sustain the claim that the deceased had no such grasp of conditions as would enable her to dispose of her property intelligently. It is apparent that at the hospital it only required suggestions to her to cause her to dispose of her property, to give bequests of the residue of her estate to charitable institutions about which she knew little, and with which she apparently had nothing to do. After she was taken to the Anderson house, we think there is sufficient testimony to warrant the contention that her attitude towards her niece entirely changed, and that she became very much embittered towards her and refused to see her, and told one witness that her niece had scared her into signing the will which she made at the hospital, although it is quite clear that her niece was not present when this instrument was made. A reading of this record is satisfying that there is evidence to sustain the contention that the Andersons and Dr. Kugler were active in getting a

will drawn in favor of the Andersons. We are also of the opinion that the jury had a right to take into consideration her confused state of mind, even while at the hospital, to consider the relations existing between the niece and the deceased prior to the time the Andersons asserted control over her, the facts and circumstances connected with the making of another will a few days preceding the making of the will in question, the conduct of the Andersons in placing her under the charge of another physician and removing her from the hospital, their excluding the niece and the friends of deceased from her, the fact that the Andersons got possession of everything that she had, their activity in procuring the will in question, Mr. Noon's refusal to aid them, and the statements made by deceased in relation to her niece. These were all facts and circumstances from which the jury might have drawn inferences of undue influence. See *Rivard* v. *Rivard,* 109 Mich. 98 (66 N. W. 681, 63 Am. St. Rep. 566) ; *In re Loree's Estate,* 158 Mich. 372 (122 N. W. 623) ; *In re Du Bois' Estate,* 164 Mich. 8 (128 N. W. 1092) ; *In re Seymour's Estate,* 111 Mich. 203 (69 N. W. 494).

We also are of the opinion that there was sufficient proof of lack of mental capacity and of insane delusions to warrant the submission of these questions to the jury. Complaint is made that the learned trial judge erred in saying in his charge:

"That all that is necessary to show that a person is mentally competent to make a will is "that the person making the will, at the time of the making of the will, have such mental faculties, and control of the same to the extent of recalling the nature and extent of her property, the number and names of her relatives, the natural objects of her bounty, and the power to retain such facts while considering her will," etc.

And it is insisted that this fixes too high a standard, that one's relatives may or may not be the natural

objects of one's bounty, and that it would be difficult to find anyone who could recall the number and names of their relatives. We do not think that the charge is subject to the criticism made of it, because it will be noted that the court, in speaking of the relatives, limited them to those who were the natural objects of her bounty, which we are of the opinion is not an improper charge, and does not bring it within the cases of *Spratt* v. *Spratt*, 76 Mich. 384 (43 N. W. 627), and *Moriarty* v. *Moriarty*, 108 Mich. 249 (65 N. W. 964).

Error is also assigned because of the failure of the court to give a request to charge that the jury should draw no unfavorable inferences to the proponent from the fact that Mr. Anderson was not sworn as a witness in the case. The court did not instruct the jury that an inference unfavorable to Mrs. Anderson might be drawn from Mr. Anderson's silence, and we do not think that the failure to give the request to charge was error, because Mr. Anderson was charged with having been a party to the influencing of the testatrix in making the will. He was present at many of the conversations had with the deceased, and knew all about her condition, and obtained possession of her personal effects. The record further discloses that he attended the trial and was present during its progress, and, in view of his relationship to the proponent, we think that to have given the instruction requested would have been improper.

There are assignments of error based upon the rulings of the court with reference to the admission and exclusion of evidence. We have examined these assignments of error, and are satisfied that in none of these rulings was prejudicial error committed.

Complaint is also made of the charge of the court in the failure to give certain requests, but a careful reading of the charge is satisfying to us that the

rights of the legatees were carefully guarded, and that the issues involved in the litigation were fairly presented to the jury by careful and proper instructions.

Being satisfied that no prejudicial error has been made to appear, we are of the opinion that the judgment should be, and is hereby, affirmed.

STONE, OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred.