## WILLIAMS *v.* WILLIAMS.

133    21
147    638

DEEDS—VALIDITY—CAPACITY OF GRANTOR.

Deceased conveyed certain land to his four sons, reserving a life estate, to save the property from being squandered through his intemperance. One of the sons afterwards died, leaving his father as his sole heir; and subsequently deceased conveyed the interest so inherited to F., his daughter-in-law, with whom he had lived for some time, and for whom he had great regard. The attorney who drew the deed testified that deceased was then of sound mind, and was not under the influence of liquor, and that he knew perfectly the character of his acts; that witness endeavored to dissuade him from his purpose, but that he persisted, and that the deed was executed and delivered to witness, to be held in escrow until decedent's death, and then to be delivered to F. *Held*, that the conveyance should be sustained.

Appeal from Macomb; Tucker, J. Submitted January 9, 1903. (Docket No. 21.) Decided April 21, 1903.

Bill by William A. Williams against Florence G. Williams and others to set aside a deed. From a decree for complainant, defendant Florence G. Williams appeals. Reversed.

The purposes of this bill are to set aside a deed executed October 30, 1899, by Charles W. Williams, now deceased, to Florence G. Williams, one of the defendants, to determine who are at the present time the owners of the lands described in the bill, and to secure a partition thereof. The court below entered a decree setting the deed aside. That portion of the decree presents the only question before us.

Mr. Williams settled at Mt. Clemens in 1865, where he engaged in the tailoring business, and became the owner of the premises in question. He lived there until 1888, when he moved into Detroit. He became addicted to the use of intoxicating liquors, largely lost his business, and became nearly, if not quite, an habitual drunkard. In 1888 he deeded the land in question to his four sons, Emil, Richard, William, and Frederick; reserving to himself and his wife a life estate in the premises. The purpose of this deed was to prevent the property being squandered by the father on account of his drinking habits. As found by the circuit judge, its purpose was to place the property where it could not be squandered by him, and to secure a certainty of income during his own life and the life of his wife.

Emil and Richard lived in Detroit, and were engaged in the livery business. About two months after the execution of the deed, his wife died, and Mr. Williams went to Detroit to live with his two sons, Emil and Richard, who managed and controlled his property, boarded and clothed him, and furnished him with what pocket money he had. He lived mostly with Richard, but sometimes with Emil. Frederick died unmarried in January, 1892. His father, Charles, was his sole heir, and thereby became the owner of the one-fourth interest in the property which he had

previously deeded to Frederick. It is this one-fourth interest which was conveyed by Charles W. Williams to Florence, and is now the subject of controversy, though the deed purported to convey the entire interest.

Richard died March 22, 1898, leaving a last will and testament. By his will he left to his wife, the defendant Florence, $1,000,—the income thereof, and the principal, if necessary, to be used by her in supplying the necessities and wants of his father when his own income was not sufficient,—and bequeathed to his wife absolutely any part of said sum remaining after the death of the father. The remainder of his property he bequeathed to her. She was made executrix of the will, and in her final account she reported that she had turned over to herself, as trustee, the said sum of $1,000.

Emil died September 20, 1899, bequeathing his property to his wife. After the death of Emil, Charles lived with the defendant Florence, and died May 13, 1900. The deed to defendant Florence was not recorded until July 20th, 10 days after this suit was commenced. The heirs knew nothing about the deed until her answer to the first bill, which was a bill for partition, was filed. The bill, by leave of the court, was then amended so as to contest the validity of this deed. Mr. Williams was 75 years old at the time the deed was executed.

*Clark, Durfee & Allor*, for complainant.

*James Swan* and *Howard S. Dean*, for appellant.

GRANT, J. (*after stating the facts*). After careful examination of the evidence, we feel compelled to reach a different conclusion from that reached by the learned circuit judge. It was a very natural thing, under the circumstances, for the deceased to execute this deed transferring the property to his daughter-in-law, Florence Williams. He had lived with her and her husband for many years. He had also lived with her after her husband's death. It is established by the evidence that she

took good care of him. His feelings towards her, and the reason for them, are shown by the testimony of Mr. Rohnert, hereinafter stated. We think he was competent to execute deeds and other papers when not under the influence of intoxicating liquors. Complainant himself admits that, if he had executed a deed when he was not drunk, he should think he was competent to make it, and would know what he was doing. It is conclusively shown that he was sober when the deed in question was executed.

Mr. Morse Rohnert, then an attorney, and now one of the circuit judges of Wayne county, drew the deed, and took the acknowledgment of it. His testimony is quite conclusive of the fact that he was mentally sound, and that no undue influence was used to obtain the deed. We quote his testimony as to the execution of the deed, and what took place at the time:

"He always spoke very friendly of Florence, as he called her. He told me all that he was indebted to Florence for, and after Emil's death he wanted me to look after the property, while he also told me that he wanted to make a deed outright of the property in Mt. Clemens to Florence. He talked to me about this matter several times. Then along about the end of October, the day the deed was drawn and signed, he came into the office one afternoon with Mrs. Florence Williams. Mrs. Florence Williams had some business to transact, and I had her go into my private office, and I finished my business with her. He sat in the outer office at the time, and I dismissed Mrs. Williams from my private office, and then Mr. Williams spoke up and said he would like to speak with me. I called him into the office. I left the office door open, and he said that he wanted to speak privately. He then told me that he wanted me to draw this deed to Florence. Well, I talked the matter over in a general way with him, and I said, 'Now, I have had experience with deeds of that kind.' He told me why he wanted it done; Florence had been very kind; that he owed a great deal to Florence; his home here was really with Richard and Florence, and all the comfort he had in his declining years was due to Florence; and that, now his sons were away, although she was not related by blood, still she was looking after him and giving him a home. I told him I had had

experience with people, particularly parents giving deeds to their children, and I thought he had better make a will, and leave it after his death. He says, 'No,' he didn't want to make a will; that wills were contested, and he wanted to avoid any contest on a will, and he wanted to have the deed drawn up and turned over to her right away. I talked about the consideration. He says, 'Now, Florence, she said she would take care of me anyway; as long as I wanted a home with her I could have it; and she has always done right by me, and I know she will do so, and I want this deed made out to her.' I told him, 'If you do make out a deed, you want to reserve a life estate, anyway.' He didn't feel as though he wanted that, but he finally said he would reserve a life estate to himself. I then told him that I wouldn't advise him to deliver the deed at once. 'Well,' he said, he wanted to deliver it. 'Well,' I said, 'you had better wait a little while.' 'No,' he said, he wanted it drawn; and at the same time he talked,—whether just before or just after, but he talked about getting this power of attorney executed to me. I think it was just after we had talked about the deed. He had talked before that about my drawing a power of attorney, and, of course, when he talked about the deed, I didn't think it was necessary to have a power of attorney; but after I had talked with him, and advised him about a better way than an absolute conveyance, then he began to talk about the power of attorney again. He then directed me to draw the deed, and also the power of attorney. I drew the deed, and I drew the power of attorney; that is, I wrote in the proper parts, and I passed it out to Miss Hill to put in the description. One of the reasons why the power of attorney was drawn was because I wanted to hold off on the deed, thinking that possibly, by giving him a day or two time on the deed, that he might reconsider the deed; that is, I wanted to feel sure that he was acting under his own volition. The deed was drawn. I then called in Miss Hill, my stenographer, and I read the deed over to her; and I also gave him the purport of it in German, and asked him if that was what he wanted. He said, 'Yes.' I then told him, if he would, to sign it. I took his acknowledgment. Miss Hill and I signed it as witnesses. * * *

" *Q.* And his mental condition at that time was what?
" *A.* Sound. He knew perfectly what he was doing.
" I then took the paper, and I told him: ' Now, Mr.

Williams, you had better think this matter over a day or two. I don't want you to deliver it to your daughter.' I said: 'If you have made up your mind to give your daughter a conveyance of it now, you had better keep it off from record, and deliver it to some one in escrow, to hold and deliver it at the time of your death, because it may be better in that way for your future comfort.' He thought the matter over a while, and he felt as though he wanted to deliver it right away. I said, 'Now, Mr. Williams, you had better think this matter over. In the meanwhile,' I said, 'we will have the power of attorney executed.' As the power of attorney was to me, I couldn't take the acknowledgment, and I went out to find a notary. I couldn't find a notary,—it was along in the afternoon, towards dusk,—and I came back. I says: 'You can't sign this power of attorney over today. You had better go home and think it over, and come back again and let me know what you want done with the deed, and at the same time you can sign the power of attorney.' I told him then that I would suggest to him, instead of delivering the deed at once and having it recorded, to leave it in escrow with me, if he wanted, and I could turn it over to Mrs. Florence Williams at his death. I told him I thought it would insure to him better care than if he parted with his title at once, and I told him to think the matter over until he came back and executed the power of attorney.
*   *   *

"He came back on the 1st,—on the day the power of attorney is executed. He came back at that time. He came back in the morning. That was two days. He came back alone. My recollection is that when he went away, so that, if there was any question about it, that I could show that it had not been delivered to me in escrow, I told him to take the deed with him. I kept the power of attorney because it hadn't been executed, and, if he changed his mind, there wouldn't be any need of his executing any other paper. I gave him the deed, and told him to think it over, and think of what disposition he wanted to make,—whether he wanted to deliver it at that time. I explained to him that, if he delivered it in escrow, it was an absolute delivery to Mrs. Williams,—she couldn't get it until he died, and he couldn't draw it back; and at the same time I told him to think the matter over, as to whether he wanted to actually make the conveyance. I gave him the instrument. He took it home with him,

and then, at the time of the execution of this power of attorney, he came back, and he told me that he wanted to deliver the instrument to me in escrow; to hold until he died, and then deliver it to Mrs. Williams."

Decree reversed, and decree entered in this court for the defendant Florence G. Williams, with costs of both courts.

The other Justices concurred.