## NELSON v. WIGGINS.

1. DEEDS — CONFIDENTIAL RELATIONS — UNDUE INFLUENCE — EVIDENCE.

That decedent, an illiterate lumberman, had long been associated with defendant in business matters, deferring to defendant's business judgment and being guided by his advice, was not evidence of undue influence, and would not invalidate the voluntary deed of decedent to defendant's wife and daughter.

2. SAME.

Undue influence must be established by evidence of threats, misrepresentations or undue flattery, fraud, or coercion sufficient to overpower the volition and freedom of action of the grantor.

Appeal from Shiawassee; Miner, J. Submitted April 5, 1912. (Docket No. 42.) Decided October 2, 1912.

Bill by Sylvester Nelson against Stephen Wiggins and others for the cancellation of certain deeds. From a decree for defendants, complainant appeals. Affirmed.

*Snow & Snow*, for complainant.

*George B. Brooks* and *Kilpatrick & Pierpont*, for defendants.

STEERE, J. In this case complainant has appealed from a decree of the Shiawassee county circuit court, in chancery, dismissing his bill of complaint, which was filed for the purpose of having set aside four certain warranty deeds, previously given by his father, John Nelson, since deceased, conveying to defendants Frances R. Wiggins and Marion F. Richards 200 acres of farm land, in Rush township, in said county. It is claimed by complainant that said conveyances were procured without consideration, by fraud and undue influence, imputable chiefly to the control defendant Stephen L. Wiggins exercised over John Nelson, with whom he had been closely related as a patron, counselor, and partner in stock raising for many years. Defendant Stephen L. Wiggins has filed a disclaimer, asserting that he has no personal interest in the controversy beyond the fact that defendant Frances Wiggins is his wife and defendant Marion F. Richards a foster child, and he makes no claim of legal interest in, or right to, the property involved. Said John Nelson was a farmer and lived upon the land in controversy for over 30 years preceding his death, most of the time alone. He died in the house on the farm November 19, 1909. At the time of his death he was about 60 years of age, and on the hearing of this suit in the circuit court about a year later Mr. Wiggins, who is charged with exerting an undue influence over Nelson which deprived complainant of his rightful inheritance, was 82 years old. Complainant's

position in this controversy is outlined in the following statement in his solicitor's brief:

" Mr. Wiggins' complete control and influence over Nelson is demonstrated by the fact that they were partners in stock raising, that they kept a bank account, and that Wiggins exercised exclusive control over the same. He used the money as he saw fit, always deposited it and always drew it out. Nelson was never permitted to do anything of this kind, and appears to have been a mere tool in the hands of Wiggins, who for years had exercised and used absolute and complete control over all matters pertaining to Nelson's business and the disposition of his property."

At the time these two men became acquainted, some 32 years prior to Nelson's death, Wiggins owned, and resided with his family upon a farm in Buena Vista township, near the city of Saginaw. He was running his farm and also engaged in lumbering in partnership with his brother. Nelson came to him seeking employment, and was given work upon the farm. He was at that time a young unmarried man, a common laborer, ignorant and illiterate, with no home or fixed place of abode, working in mills, lumber camps, and wherever else he found employment, of good disposition and a hard worker when employed, but without resources and improvident, given at times to excesses in the use of intoxicating liquors and other dissipations, characteristic of many of the men who followed the woods and mills in those days. He occasionally indulged in these relaxations from a temperate and steady life up to the time of his death, which was reported to have been the culmination of one of them, though, after he settled upon his farm, they were not so frequent or of such long duration as to seriously interfere with his efficiency. Wiggins found him honest, a hard worker, and of agreeable disposition, and took an interest in him, giving him a home and employment on the farm when not at work in the Wiggins Bros. camps in the woods. In October, 1877, Wiggins bought of his brother the E. ½ of the S. E. ¼, section 28, town 8 N., range 2 W., for

$2,000, the deed to which he directed should be made to Nelson, which was done, the latter giving back to the brother a mortgage thereon for $2,000. Wiggins later paid this mortgage in an adjustment of partnership matters with the brother, and took an assignment of it.

Nelson had married the preceding March, and, after acquiring title to this land, moved upon it with his wife. There were few improvements on the property, and no suitable buildings. With Wiggins' assistance, he built a house and barn; Wiggins paying for the material and carpenter work. While he lived with his wife on the farm, one child, a daughter, was born, who died in early childhood. Within two years his wife left him, taking with her most of their household effects. He remained on the farm, living in the same house, much of the time alone and doing his own household work, until his death, having obtained a divorce. A few months after his wife left Nelson, complainant was born. Nelson claimed complainant was not his son, and apparently took no interest in him. Complainant testified he first saw his father by a chance meeting on the street when three years of age, and again under like circumstances when five years old. When 15 years of age complainant went to the farm and saw his father, staying long enough to have dinner, and again in 1895. There was no mutual recognition or apparent knowledge of each other from then until November, 1909, when complainant called, two days before his father's death, had dinner, and went on to Owosso. His father was then unconscious. Wiggins, whom he met there, promised to send him word of the result of the sickness, and did so when it terminated fatally. These facts are material only as bearing on the existence or nonexistence of paternal and filial relations and sentiments between them and the motives actuating John Nelson in making the conveyances complained of. On that subject Wiggins testifies:

"He never appeared to have very much interest in him; didn't show that.

"*Q.* What did he ever say to you about it?

"*A.* Well, he always said to me that Sylvester didn't belong to him, and he wasn't his child. He didn't care a damn about him. That is what he has told me.

"*Q.* What, if anything, did you ever say, directly or indirectly, to lead John Nelson to say that?

"*A.* I never did anything, or said anything, that I wanted it to appear or make him feel hard toward him (complainant) or to cultivate that feeling. I done and said a good deal towards him. I claimed to him that he was his boy—that he better treat him in that way. His treatment toward his son was always, as I have said, except the last time, I thought he acted and talked a little more favorable toward him. That was in 1904 or 1905."

After the termination of Nelson's married life, Wiggins continued on friendly terms with him, manifestly having confidence in and disposed to sustain and assist him. He had helped to erect the buildings on the land, and furnished him money from time to time to purchase necessaries and make improvements. Nelson's acquisition of this real estate was engineered and financed by Wiggins, and it seems evident that they were mutually interested in its use and development. For a number of years Nelson, living there alone and working industriously on the farm, made little headway except to improve the place, though, with the assistance of Wiggins, he began to occasionally employ help as early as 20 years before his death. Prior to 1897 Wiggins purchased an adjoining 80 acres, being the E. $\frac{1}{2}$ of the N. E.$\frac{1}{4}$ of section 32, from certain parties named Camp & Brook for $900, subsequently paying therefor in full and having the deed, bearing date January 5, 1897, made to John Nelson, and in 1903 the other 80 acres of the 240-acre farm was purchased by Wiggins from the same parties, being the N. $\frac{1}{2}$ of the N. W. $\frac{1}{4}$ of section 33, and deeded by his direction to John Nelson for the expressed consideration of $1; its estimated value at that time being $800. Some 16 or 18 years before Nelson died a partnership arrangement was entered into between him and Wiggins for the raising of stock and operating the farm to that end. The beginning of the herd

was furnished from Wiggins' farm near Saginaw. During the summer this stock was driven to pasture on wild lands in Midland county belonging to Wiggins, and during the winter they were fed and cared for by Nelson on the farm. This enterprise appears to have proven profitable, and their partnership assets increased both in live stock and accumulation of farm tools, and other personal property on the place. Up to the time this stock was put upon the farm, Nelson had made little, and saved no money. He had only bettered his condition to the extent of the increase in value of the land and improvements he made upon it. After they went into the stock business, their affairs became more prosperous, and a reasonable profit was realized for six or seven years before Nelson died, during which time they had a modest bank account carried in Nelson's name, but handled by Wiggins, as were most of their outside business matters. Nelson during these years increased his education only to the extent of learning to write his name. An officer of his township testified that at elections he always required assistance in preparing his ballot. He was industrious and attentive to the affairs of the farm, was liked by his neighbors, and considered honest and obliging, but was reticent as to his private affairs, living quietly alone on the farm, except as he had help, or members of the Wiggins family were there occasionally. His friendship and relations with Wiggins and his family remained unbroken until his death. He was treated as one of that family, and so regarded himself. The evidence clearly shows that Nelson and Wiggins had mutual regard for and confidence in each other, and each trusted the other.

Wiggins was a business man of extensive experience. He was engaged in lumbering operations for 30 years, at times handling large interests and in affluence, at other times meeting reverses. Nelson's business ability and experience were limited. He was a farmer and laborer. That he relied upon Wiggins, deferred to his business judgment, and was guided by his advice is not to be

doubted. Such relations do not imply coercion or undue influence. Confidence in, respect for, and desire to please another, or the influence of long association, affection, or gratitude, are neither coercion nor undue influence. *McFadin* v. *Catron*, 138 Mo. 197 (38 S. W. 932, 39 S. W. 771); *Campbell* v. *Carlisle*, 162 Mo. 634 (63 S. W. 701). It is claimed, and the testimony tends to show, that at one time Wiggins put certain of his property in his wife's name and his investments in these lands in Nelson's name to evade certain creditors who held paper on which he was liable. The record shows that in 1889 Nelson deeded the E. ½ of S. E. ¼, section 28, to Wiggins for a stated consideration of $2,000; that Wiggins and wife deeded it back to him in 1896 for a stated consideration of $8,000, Nelson giving Wiggins a mortgage on the property for $5,000 on the same date. This mortgage was discharged of record in December, 1901. On November 10, 1903, Nelson gave two deeds of this property, one of a half interest and one of full title, to Wiggins' wife, Frances R., one of the defendants in this case, and on the same date he deeded the N. ½ of N. W. ¼, section 33, to defendant Marion F. Richards. December 23, 1905, he gave to said Frances R. Wiggins a deed of an undivided one-half of the E. ½ of N. E. ¼, section 32; thus disposing of all the farm but 40 acres. In each of these later deeds the expressed consideration was $1. If Wiggins, in the first instance, put this property in Nelson's name to sequester it from creditors, he could not legally recover it. Thereafter, as between themselves, it belonged to Nelson, who could dispose of it as he saw fit. As suggested by counsel for complainant, such transfers, if for such a purpose, are evidence derogatory to Wiggins' integrity and credibility. They might also have some bearing in explanation of Nelson's motive in conveying the property to Wiggins' family. Of their mutual interest in this land, Wiggins testifies:

"He was supposed to own a portion of that land always, and I was always supposed to own a portion, and

he wanted his portion to go where he deeded it and I wanted mine to go the same. * * * My wife did not know the history of this land at all, except when Nelson used to tell it. * * * Since I met John 35 years ago I have been more or less closely associated with him. * * * I had confidence in him, and had no hesitation in turning over my property to a man such as he was. I didn't charge anything up against him on the ground of intoxication."

Irrespective of whether he acted on Wiggins' request or advice, or on his own initiative, and irrespective of his reasons or motives, Nelson could convey this property during his lifetime as, and to whomsoever, he chose. These conveyances are valid on their face, and not to be disturbed unless the claim of complainant is established, by a preponderance of competent evidence, that they "were obtained through fear and undue influence and coercion of said Stephen L. Wiggins over said John Nelson." Wiggins positively denies this, and there is no direct proof of any intimidation, demand, threats, or even persuasion on the part of any one. In 1894 Nelson, of his own volition so far as shown, went to an attorney of his acquaintance, whom he had before consulted in regard to his private matters, and had a will drawn, which he executed, leaving his property to the Wiggins family, stating his reason for so doing. The attorney who drafted the will, an elderly and respectable member of the bar, testified from memory as to its contents. He could not recall any descriptions of property, but remembered that everything went to the Wiggins family; Nelson stating "something about their giving him a home and that the family had been his friend, or something of that kind, which he wanted put in the will," and that he also provided in the will a certain sum, $300 or $400, to defray half of the cost of a monument for the family lot, with a request that his name be put on the monument, and he be buried in the lot. Such request was complied with, and he was buried where he had requested. This will was

afterward destroyed at his dictation.   Wiggins states the reason and circumstances as follows:

" I knew he made a will some years ago, and willed his property as he wanted it to go, as I understand.   I ·don't know that I ever read the will or ever heard it read—not all of it—and it ran along for quite a number of years, I wouldn't say how long, and he got it in his head he had heard about people breaking wills so much.   He said one time, says he, ' I'm going to destroy that will; have it burned up and deed my property to the one I want it to go to, and then there won't be no fighting over will.'   And he did this.   *   *   *   The will he gave to my wife and told her to burn it up, and I see her put it in the stove.   That is all I know about a will.   *   *   *   He was buried in Forest Lawn, Saginaw.   His name was put on the monument before it was put up.   His name has been there for years."

Shortly after the will was destroyed, he requested Wiggins to accompany him to an attorney's office to make out the deeds as he had declared his intention to do.   He there stated to the attorney what he wanted and what papers he desired to make.   The two deeds of November 10, 1903, were drawn up and executed by him.   He told the attorney he did not intend they should be delivered until after his death.   The attorney testifies:

"I told him it would be necessary to deliver them in escrow to a third party, to be delivered at his death, and, as Mr. Wiggins states, he said he would deliver them to Mr. Wiggins—that is, Mr. Nelson said that, for delivery at his death—and they were handed to him, and that is the last I know about the transaction."

When Nelson died, Wiggins sent complainant notice, and later an amicable settlement was made covering all partnership matters connected with the stock raising and other operations on the farm, Wiggins paying complainant $1,500 for his interest.   As the only heir of John Nelson, he would also inherit the undivided E. ½ of N. E. ¼, section 32, which was not included in any of the deeds in controversy.

To establish undue influence, it must be made of threats,

or misrepresentation, or undue flattery, or fraud practiced, or physical or moral coercion sufficient to overpower volition, destroy free agency, and impel the party upon whom it is practiced to act against his inclination and will. *Herster* v. *Herster*, 122 Pa. 239 (16 Atl. 342, 9 Am. St. Rep. 95). Motive, opportunity, or even ability to control, in the absence of affirmative evidence that it was exercised, are not sufficient.

" It is not sufficient to show that the circumstances attending its execution are consistent with the hypothesis of its having been obtained by undue influence. It must be shown that they are inconsistent with a contrary hypothesis." *Boyse* v. *Rossborough*, 6 H. L. Cas. 2.

The facts proven by complainant are not sufficient, in our opinion, to even shift the burden of proof upon the defendants to show that the conveyances were not obtained by coercion and undue influence, though they have introduced much affirmative testimony along those lines. Nelson's disposition of his property was consistent with the history of its accumulation, his associations and friendships, and an expressed purpose of many years' standing.

The decree dismissing complainant's bill is affirmed, with costs.

MOORE, C. J., and McALVAY, BROOKE, STONE, and OSTRANDER, JJ., concurred. BIRD, J., did not sit.