## NOBLE *v.* HUNTER.

1. DEEDS—CAPACITY OF GRANTOR—EVIDENCE—UNDUE INFLUENCE—PARENT AND CHILD.

   On a bill to set aside deeds on the grounds of mental incapacity and undue influence, evidence *held*, sufficient to show that plaintiff's deceased father was mentally competent at the time of the execution of certain deeds, although he was at the time sick in bed, and had been, prior to that time, under a high fever and in a delirious or apathetic condition from typhoid.[1]

2. SAME—UNDUE INFLUENCE—OPPORTUNITY—EVIDENCE.

   Opportunity for the exercise of undue influence upon a party executing an instrument is not proof of its exercise; proof of opportunity alone is not sufficient.

3. SAME—CANCELLATION OF INSTRUMENTS—VALIDITY—BURDEN OF PROOF—UNDUE INFLUENCE—FIDUCIARY RELATIONS.

   On a bill to set aside deeds on the grounds of mental incapacity and undue influence, evidence *held*, sufficient to sustain a finding that fiduciary relations existed between plaintiff's father and her brother at the time of the exe-

---

[1]On presumption and burden of proof as to undue influence respecting gifts *inter vivos* from parent to child, see note in 35 L. R. A. (N. S.) 944.

cution of such deeds by her father conveying certain property to her brother and to her stepmother, so as to impose the burden of proof upon defendants to show the validity of the transaction.

4. WITNESSES—PRINCIPAL AND AGENT—MATTERS EQUALLY WITHIN KNOWLEDGE OF DECEASED.

An attorney, to whom plaintiff's father sent her brother to prepare certain deeds held by such attorney in escrow until the father's death, was not an agent or attorney for the brother, and was therefore not incompetent, under section 10212, 3 Comp. Laws, as amended by Act No. 239, Pub. Acts 1901 (3 Comp. Laws 1915, § 12553), relating to transactions with deceased persons, to testify in a suit brought after the father's death for the cancellation of such deeds.

5. SAME—NAKED TRUSTEE.

The holder of a deed in escrow until the grantor's death is at most a naked trustee and as such is not prevented by section 10212, 3 Comp. Laws, as amended by Act No. 239, Pub. Acts 1901 (3 Comp. Laws 1915, § 12553), relating to transactions with deceased persons, from testifying in a suit brought after the grantor's death to set aside the deed.

Appeal from Ottawa; Cross, J. Submitted January 3, 1917. (Docket No. 24.) Decided April 9, 1917.

Bill by Josie Noble against Mark L. Hunter and others to set aside certain deeds, and for an accounting. From a decree for defendants, plaintiff appeals. Affirmed.

*Charles E. Misner* and *Smedley & Linsey*, for plaintiff.

*Lillie, Lillie & Lillie* (*Ernest L. Marvin*, of counsel), for defendants.

FELLOWS, J. The bill in this case is filed to set aside, on the grounds of mental incapacity and undue influence, two deeds executed by complainant's father shortly before his death and for an accounting from

defendant Mark L. Hunter of the proceeds of certain certificates of deposit and a note turned over to Mark by his father about the time the deeds were executed. Plaintiff Josie Noble and defendant Mark L. Hunter are the children, and all the children of Silas Hunter, deceased. Silas was an old soldier; had retired from farming and lived in Coopersville, Ottawa county, for a number of years. He and his comrades and other old cronies frequently and almost daily played cards in the saloons at Coopersville. The record shows that he was something of a steady drinker, but it does not show that he was a dissipated man, or that he became intoxicated. Plaintiff also lived in Coopersville, and had for a great many years. Mark lived in Beaumont, Tex., and had for 15 years. Silas' wife, the mother of plaintiff and Mark, died in November, 1912, and Silas thereupon took up his home with plaintiff. In January, following his wife's death, he and his sister Mrs. Murdock went to visit his son and other relations in Texas. Silas spent most of his time with his son, returning to Coopersville and plaintiff's home in April. Silas does not appear to have been over-punctual at meal times, and, while this did not cause serious friction between father and daughter, he decided to take his meals at the hotel where he could get them at any time, but continued to room at the Noble home until July, 1913.

Defendants called as a witness Philo P. Henderson, a neighbor of plaintiff, who testified that the last of July he heard a conversation between plaintiff and her father; he testifies:

"She said that he was a drinking man; a drunken old devil, or something; I don't know exactly; I ain't going to say exactly what she said; and he was spending his money for whisky and on women—now that I did hear. He left her home that very day."

Mrs. Henderson corroborates the testimony of her

husband. The plaintiff denies this conversation. There is nothing upon the record to impeach the testimony of these two neighbors. The houses were about 100 feet apart, and Silas Hunter's hearing was somewhat impaired, and one had to speak quite loud to make him hear. It is admitted on all hands that he left plaintiff's home at about this time, and never visited plaintiff again, nor did she visit him. In his last sickness she was advised of his condition and urged to visit him, but she failed to do so, and did not attend his funeral. She gives reasons of more or less plausibility for this; while they might satisfy this court, it is to be remembered that the property involved in this litigation was the property of Silas Hunter. It was his to give and his to withhold, and he, and not this court, had the determination of the question as to who was entitled to his bounty.

In March, 1914, Mr. Hunter married Margaret Dumis, a widow who owned a home in Coopersville about three blocks from plaintiff's residence. After the marriage Mr. and Mrs. Hunter took up their home in this house, and continued to reside there until his death.

For a couple of weeks prior to October 7, 1914, Mr. Hunter had been ailing, but had supposed that his condition was due to rheumatism, and home remedies had been applied. On this day he was up and about, but a physician was called, who found him afflicted with typhoid fever, with a temperature of 103. He was at once ordered to bed and put on treatment for that disease. The doctor who attended him during his entire illness testified that while the fever was up his mental condition was rather apathetic, and he was more or less drowsy, due to the high temperature, but that there was no delirium. That the apathetic condition was not due to any drugs administered, but that his drowsiness was due to the toxemia that comes from

the typhoid, and that when his temperature lowered
the apathetic condition cleared out, and that before the
arrival of the son Mark, the fever had cleared out,
and that after the temperature lowered Mr. Hunter
was all right mentally.   Mark's aunt, Mrs. Murdock,
informed him by telegram of his father's illness, but
there was an error in transmission of the telegram,
and Mark did not reach Coopersville until the after-
noon of October 13th. He remained at his father's
home until after his father's death, but soon after his
arrival he called at plaintiff's home and visited with
her and her family.   The old gentleman realized his
condition and the seriousness of his illness, and sent
his son Mark to Mr. Ernest L. Marvin, an attorney of
high standing and unquestioned probity, and an ac-
quaintance of many years of Mr. Hunter, to have him
prepare deeds of his property, conveying to his son
Mark a livery stable owned by him in Coopersville, and
to his wife, Margaret, his house and lot, the value of
the two pieces being $2,500.   Mr. Marvin prepared the
two deeds in his office before going to the Hunter resi-
dence.   Upon arrival at the Hunter residence he had
some general conversation with Mr. Hunter:

"* * * And finally I said to him—I had to speak
pretty loud because he was a little deaf; I said, 'Hun-
ter, they tell me you want to fix up some papers.
Now,' I said, 'What do you want to do?' and at that
time he said, 'I want to deed that livery stable prop-
erty to Mark, and I want to deed my house on Main
street to my wife, Margaret.'   Then I went on and
showed him the deeds.   I said, 'This deed is the deed
of the livery stable property, and it runs to Mark';
and I said, 'The date is all put in, and ready to sign';
and I said, 'Do you want to sign that?' and he started
to turn over in bed to get in shape to sign the deed,
and I said, 'If you feel too weak to sign, you can sign
by mark'; and it was arranged that he should sign by
mark, and I wrote his name on the deeds myself.   I
explained both deeds; told him that one deed run to
Mark Hunter and the other deed run to his wife, Mar-

garet Hunter. * * * After he had made the mark, I asked the question, 'You acknowledge this to be your free act and deed?' and he said, 'Yes, I do.' "

The deeds were witnessed and taken away by Mr. Marvin to be held in escrow, delivery to be made on Mr. Hunter's death; at the same time the old gentleman indorsed a certificate of deposit and a note, both of which were then in the possession of Mark. Mrs. Hunter executed an agreement which recites in substance that in consideration of the house and lot being deeded to her she would make no further claim on his property. Mr. Hunter also stated to Mr. Marvin that Mark was to give Mrs. Murdock, sister of Silas, $200; Mrs. Ackerman, a sister of Mr. Hunter's first wife, $200; to plaintiff's children, $25 each; to plaintiff, $100, and was to see that some furniture stored at plaintiff's home was delivered to Mrs. Ackerman. This transaction occurred on October 15, 1914, and on the 20th of October Mr. Hunter died, at the age of 77 years.

In addition to the livery stable Mark was also given certificates of deposit to the amount of $1,350, and the note of $100, above referred to. Mark paid the expenses of his father's last sickness, the funeral expenses, and all of his father's indebtedness, including that to Mr. Marvin, who, after the death of Mr. Hunter, delivered the deeds pursuant to his instructions.

The bill in this case was filed September 1, 1915. In the meantime Margaret Hunter had died, leaving as her sole heir defendant William V. Meggison, and Mark had sold a part of the livery stable property to defendant Joseph Dyk, who, it is claimed, purchased with notice of plaintiff's claim.

It is not, and cannot be, claimed upon this record that there is any evidence of mental disorder, except such as was produced by the disease of typhoid fever.

Witnesses who saw him when his fever was high and he was in this apathetic, drowsy condition, testified that in their judgment he was not in a mental condition to transact business, but the doctor who attended him, Mr. Marvin and the nurse who witnessed the papers, pronounced him mentally competent to execute the instruments in question when he did execute them, and many neighbors and old friends who saw him during his last sickness pronounced him mentally competent. The fact that they were admitted to the sick room in violation of the doctor's orders does not militate against their testimony, nor does the fact that other old friends were excluded in compliance with the doctor's orders take the place of substantive proof. The papers were executed after the fever had been broken and his temperature had run down. The only testimony tending to show mental incapacity was while the fever was on. Not only is the record barren of any testimony of mental incapacity at the time the papers were executed, but the testimony in the case affirmatively and conclusively establishes that he was mentally competent to execute the papers at the time of their execution.

It is urged on behalf of plaintiff that she has established as a fact undue influence on the part of Mark over his father, and that in any event fiduciary relations existed between Mark and his father, and that the burden rests upon defendants to show that the transaction was in all regards fair, and that the father had independent advice before he executed the papers in question. Mr. Hunter apparently was fond of his son and had confidence in him, but this should be and is the usual relation between parent and child; it does not establish undue influence. The most that can be said of the proof submitted by plaintiff on the fact of undue influence is that about a year and a half before the execution of these deeds Mr. Hunter spent

several months with his son in Beaumont, Texas; that for two days before the execution of the deeds Mark was with his father at his Coopersville home. This proves opportunity for its exercise, and it proves nothing more. Opportunity for the exercise of undue influence is not proof of its exercise; proof of opportunity alone is not sufficient. *Severance* v. *Severance*, 90 Mich. 417 (52 N. W. 292) ; *Blackman* v. *Andrews*, 150 Mich. 322 (114 N. W. 218) ; *In re Williams' Estate*, 185 Mich. 97 (151 N. W. 731).

But it is urged that the fiduciary relations are shown to have existed between Mark and his father, and that therefore the burden rests upon the defendants to establish the validity of the transaction, and many authorities from this and other States are cited to the effect that where such relations are shown to exist the burden is upon him holding such relations, and seeking the enforcement of an unfair or unconscionable contract to show that it was fairly entered into, after independent advice, and without fraud or undue influence. It will not profit the parties or the profession to discuss these authorities, as we are satisfied that there is nothing on this record from which we should or could find that the fiduciary relations existed. The language of Mr. Justice STEERE, speaking for this court in *Nelson* v. *Wiggins*, 172 Mich. 191, 196 (137 N. W. 623.), a case where the proofs were much stronger upon this question than in the instant case, is quite in point. He there said:

"Wiggins was a business man of extensive experience. He was engaged in lumbering operations for 30 years, at times handling large interests and in affluence, at other times meeting reverses. Nelson's business ability and experience were limited. He was a farmer and laborer. That he relied upon Wiggins, deferred to his business judgment, and was guided by his advice is not to be doubted. Such relations do not imply coercion or undue influence. Confidence in, respect for, and desire to please another, or the influ-

ence of long association, affection, or gratitude, are neither coercion nor undue influence."

Mr. Hunter's relations with his son were not out of the ordinary. It is apparent that he realized that death was approaching, and that he wanted to provide for the disposition of his property. Over a year before that he and plaintiff had become estranged, and she was responsible for that estrangement; for over a year she made no effort to effect a reconciliation with her father.

We are satisfied that the plaintiff has failed to make out a case of mental incapacity or undue influence, and that the disposition made by Silas Hunter of his property, and which is here assailed, represents his free and intelligent act.

It is insisted, however, by the plaintiff, that there is no competent proof of the delivery of the deeds; that Mr. Marvin was the agent and attorney for Mark, and therefore his testimony was inadmissible under section 10212, 3 Comp. Laws, as amended by Act No. 239, Pub. Acts 1901 (3 Comp. Laws 1915, § 12553). It is unnecessary for us to decide the effect of this statute if Mr. Marvin had been acting as the agent of Mark, as we are satisfied that Mr. Marvin was not acting in that capacity. Mr. Hunter sent for Mr. Marvin to make out these papers. He was then on his deathbed and unable to go to Mr. Marvin's office. Mark was only the messenger for his father, and was not Mr. Marvin's principal. After the deeds were made out they were given to Mr. Marvin, with instructions from the grantor to retain until Mr. Hunter's death, and then deliver them to the grantees. He was at most a naked trustee, and as such was not precluded from giving testimony. *Jenkinson* v. *Brooks,* 119 Mich. 108 (77 N. W. 640). The amendment of 1901 does not change the rule announced in this case, as the trustee

selected by the decedent to deliver the instruments held by him in escrow cannot be held to have "acted as an agent in the making or continuing of a contract with any person who may have died."

Having reached the same conclusion as the trial court, it follows that the decree must be affirmed. Defendants will recover costs of both courts.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred.