HAWTHORNE v. DUNN.

1. APPEAL AND ERROR—CHANCERY CASES IN SUPREME COURT HEARD DE NOVO.

The Supreme Court hears chancery cases *de novo* with a duty of reaching an independent conclusion, and, while aided by the conclusions of the trial judge, is not controlled by them.

2. DEEDS—MENTAL COMPETENCY OF GRANTOR — EVIDENCE — SUFFICIENCY.

While frequent changes in the disposition of property may tend to show instability of purpose, such changes, standing alone, do not make a case of mental incapacity warranting the voiding of deeds or wills.

3. SAME—CANCELLATION OF INSTRUMENTS—MENTAL COMPETENCY.

In a suit by the other heirs to set aside a deed of a farm to

The question of capacity to make contract as affected by mental condition is discussed in a note in 3 L. R. A. (N. S.) 174.

On effect of delivery of deed to grantee, subject to future extrinsic condition, see note in 16 L. R. A. (N. S.) 941.

grantor's brother on the ground of mental incompetency, the record *held,* convincing that grantor was mentally competent when he executed the deed in question, that he fully understood its effect, that he deliberately executed it, that by it the property conveyed went as he wanted it to go, and that he had good reason to prefer grantee over at least some of the plaintiffs.

4. SAME—POSSESSION BY GRANTOR OF CONVEYED LAND—EFFECT.
    That grantee allowed grantor to continue to rent the farm and collect the rent as though it were his own, would not render the deed void.

5. SAME—DELIVERY TO GRANTEE—INTENT NOT TO BE INQUIRED INTO —ESCROWS.
    Where the evidence failed to establish mental incapacity of grantor, and no trust relations were involved, the intent of the parties, where the deed was delivered to the grantees, cannot be inquired into; a delivery in escrow to the grantee not being permitted. ·

Appeal from Oakland; Rockwell (Kleber P.), J. Submitted January 20, 1920. (Docket No. 60.) Decided April 28, 1920.

Bill by Catherine Hawthorne and others against William Dunn and another to set aside a deed. From a decree for plaintiffs, defendants appeal. Reversed, and bill dismissed.

*Dondero, Royston & Howarth (A. L. Moore,* of counsel), for plaintiffs.

*Lungerhausen, Weeks & Lungerhausen (James H. Lynch,* of counsel), for defendants.

John Dunn, a resident of Macomb county, died May 15, 1915, leaving as his next of kin plaintiff Catherine Hawthorne, a sister, plaintiffs Frank Dunn and Terrence Dunn, brothers, plaintiff Francis Dunn, a nephew, and defendant William Dunn, a brother. He had

for a great many years owned a farm in Oakland county said to be worth from $12,000 to $18,000. On August 6, 1912, decedent conveyed by warranty deed the premises to defendants William Dunn and Ellen Dunn, his wife. This bill is filed to set aside this deed.

Decedent was a single man, 74 years old at the time of his death. He had been a soldier in the war of the rebellion and had always lived in Oakland and Macomb counties. In the later years of his life he had spent some time in the Soldiers' Home at Grand Rapids. He was addicted to the use of intoxicating liquors and at times drank to excess. There is evidence that some 14 or 15 years before his death he had *delirium tremens;* that he took the gold cure, but resumed his former habits. He acquired the premises April 27, 1874. On October 18, 1876, he conveyed the premises to his brother Francis, and on December 14th of the same year his brother reconveyed them to him. July 27, 1907, he conveyed them to his brother William who reconveyed them to him on August 5th of the same year. On October 15, 1909, he conveyed them to his sister, Catherine, who reconveyed them to him September 25, 1911. March 12, 1912, he conveyed them to his brother William and his sister Catherine; on August 6, 1912, both executed quitclaim deeds to him. On this date the deed in question was also executed.

The ground of relief is mental incapacity of deceased. The learned trial judge did not specifically find that deceased was mentally incompetent at the time the deed in question was executed, but did conclude from the making of the prior deeds above set forth that decedent did not have a "sane or rational conception of the meaning of a warranty deed," and entered a decree for the plaintiffs, from which the defendants appeal. In this court it is urged that the trial judge saw the witnesses, was better able to judge

their credibility than are we from an examination of the printed record, and that the decree should be affirmed because—

"The trial court found:

"*First.* That John Dunn was a drinking man;

"*Second.* That he had *delirium tremens;*

"*Third.* That he had taken the gold cure;

"*Fourth.* That he had conveyed his property first to one and then to another; and

"*Fifth.* That John Dunn appeared to possess no sane or rational conception of the meaning of a warranty deed;

"*Sixth.* That he believed that he must dispossess himself of his property in order to gain admission to the Soldiers' Home;

"*Seventh.* That he did not believe the deceased expected the deed in question to have any more binding effect upon himself than the many other deeds he had frequently executed which by inference the court finds were all void deeds."

FELLOWS, J. (*after stating the facts*). We realize full well the advantage possessed by the trial judge, due to the fact that he sees the witnesses and is able to better judge their credibility than can we by an examination of the printed record. But we hear chancery cases *de novo* with a duty of reaching an independent conclusion aided as we must be by the conclusions of the trial judge but not controlled by them. There is no evidence in this case in the slightest degree tending to show that any fraud or undue influence was practiced on the deceased, nor is there any claim that fraud or undue influence is established. The decree must rest and solely rest upon the ground that John Dunn was mentally incompetent to transact the business in hand when he executed the deed in question. The learned chancellor nowhere in his opinion directly states that he found deceased was incompetent to transact business. He was led to make the decree appealed from because the deceased in the

latter years of his life made four different deeds of his property. From this fact and from this fact alone he concluded, not that deceased was a mental incompetent, but that he did not have a "sane or rational conception of the meaning of a warranty deed." Not only is this the basis of this decree, but it is the only basis upon which a decree could be entered. There is in this case no proof of a single irrational act of the deceased when he was sober in his entire life of 74 years. If we were considering a will contest and the proof showed that the testator had drank liquor, even excessively, and some 14 or 15 years ago had had *delirium tremens*, had taken treatment for the habit, but returned to it, and during the last 7 or 8 years of his life had made 4 different wills, and the last one was made when he was perfectly sober, and upon such testimony it was asked to have the will set aside, would this court hesitate for a moment in saying that there was no testimony to take the case to the jury and that a verdict should be directed? We think not. While frequent changes in the disposition of property may tend to show instability of purpose, and, where undue influence is proved or fraud is established, or there is independent proof of mental incapacity, may be considered; such changes in the disposition of one's property standing alone do not make a case of mental incapacity warranting the voiding of deeds or wills.

We are convinced by the testimony in this record, by that of the plaintiffs, as well as that of the defendants, that the deceased was mentally competent when he executed the deed in question, that he fully understood its effect, that he deliberately executed it, that by it the property went as he wanted it to go, and that deceased had good reason to prefer his brother William over at least some of these plaintiffs. We shall briefly consider some of the testimony which impels this conclusion.

That John Dunn, called by his immediate friends Jack Dunn, was a drinking man and became intoxicated on occasions, this record establishes. That such occasions were as frequent as claimed by one side or as infrequent as claimed by the other, I very much doubt. There is testimony, largely from interested witnesses, that he had *delirium tremens,* but that was 14 or 15 years before the transaction in question. That he was fully aware of his own frailty this record discloses. He knew better than any one else his condition when under the influence of liquor, and on occasions expressed apprehension that he might, when intoxicated, sign some papers that would deprive him of his property, and it is possible that we might infer that on some of the occasions when deeds were made by him his purpose was to place the title to his real estate in others to insure against such a happening. Doubtless John Dunn was not familiar with our statute of uses and trusts (3 Comp. Laws 1915, § 11565, *et seq.*). He stated to one witness that he had deeded his property before and had always gotten it back and that he could do so after the last deed. But the fear expressed by him to several witnesses that when he was under the influence of liquor he might sign some papers causing him to lose his property is quite convincing that he knew the meaning of a deed.

Deceased in his lifetime executed five deeds conveying these premises to members of his family. If we include the whole number they covered a period of 36 years, the first one being in 1876. The last four deeds cover a period of 5 years, from 1907 to 1912. In 3 of these 4 deeds defendant William was a grantee. It is a significant fact that on the very day John Dunn executed the deed in question the plaintiff Catherine Hawthorne had executed a deed of the property to him. If her brother was then a mental incompetent, if he was so enfeebled mentally as to be incapable of

handling and managing his property and could not be trusted with it because of his mental condition, the question at once arises, Why did this sister put the title to that property back in him?

Upon the argument considerable was made of the fact that deceased thought he had to deed his property away in order to become an inmate of the Soldiers' Home. If the deceased did entertain that idea it was not a delusion. The act creating the Michigan Soldiers' Home makes it a home for those "who have no adequate means of support" (1 Comp. Laws 1915, § 1674), and whatever we may think of the public policy of permitting one to divest himself of his property in order to obtain a home and support at the expense of the State, it is not evidence of a diseased mind, on the contrary, as applied to this case, it shows that Mr. Dunn knew the effect of a deed. Deceased was not an inmate of the Soldiers' Home at the time of his death, as stated by the trial judge; for 14 months he had lived with and been cared for by the defendants until 8 days before his death when he was taken to Harper's Hospital in Detroit where he died.

The record does not clearly and satisfactorily disclose the relations between deceased and his brother Frank, one of the plaintiffs here. It does show the relations between him and his brother Terrence, another one of the plaintiffs, were unfriendly and had been so for a great many years. Delisle Hawthorne, a son of plaintiff Catherine Hawthorne and one of the plaintiffs' witnesses, testifies:

"My uncle Terry and John had not been on good terms for quite a number of years—30 years, something like that. They hadn't spoken. They had some trouble a number of years ago."

And Mary Dunn, wife of Terrence and one of plaintiffs' witnesses, says:

"Have always lived in Troy township. Our home

is right across the home of William Dunn. Knew John Dunn in his lifetime. Saw him around there the last year before he died. I have known him ever since I was married. Never spoke to him much. The last year he was here several times at my house. He did not call at our house very often unless Bill sent him over. Brought over some liver and one day some meat. He never came unless Bill sent him."

There is much other testimony which corroborates that of these two witnesses as to the want of harmony between these two brothers.

The record discloses that the nephew, Francis Dunn, one of the plaintiffs, acquired his farm either by will or descent from his parents or one of them. The record does not disclose as clearly as might be desired the detail, but it does disclose that there was litigation —a will contest—and that deceased (John Dunn) hired the late Col. John Atkinson for his nephew Francis and otherwise assisted him in obtaining the farm. The record also discloses that the nephew Francis was not thrifty and had not kept the property. The deceased was not pleased with this. One of plaintiffs' witnesses, a tenant of deceased, testified:

"He explained about his nephew Frank when he was boarding with me in the summer of 1912. He said something about he had been helped—he gave him a good start and he didn't know enough to keep it."

We are satisfied that there was trouble between deceased and the Hawthorne family and that it grew out of the fact that a neighbor named Brace while in trouble deeded by voluntary conveyance his property to Robert Hawthorne, the husband of Catherine Hawthorne, one of the plaintiffs. After the storm was over Hawthorne declined to settle with Brace but sold the property and pocketed the proceeds. That John Dunn disapproved of this manner of getting on in the world appears from the testimony of both plaintiffs' and defendants' witnesses. I am satisfied this caused trou-

ble, and while Hawthorne denies that he ordered deceased from his home after a row over this matter, he does testify with reference to the transaction with Brace and his dealings with Brace and his property as follows:

"Going back to the transaction with Tom Brace and Sara Brace, I got a deed of 95 acres from Sara Brace, Tom's wife. I paid no money for it. Tom got into trouble with a girl and she took judgment against him, and to cover up the property, it was deeded to me. I held this property for some time, and Tom Brace left the country for a while and he came back. I deeded that property to Isaac Brace for $65 an acre. Ninety-five acres at $65 would bring $9,000, but there were mortgages that had to be paid, three or four mortgages. There was a mortgage for $850, one for $380, and one for $1,600. aggregating $3,000. I don't think I ever paid Tom Brace any money."

Martin Blunt, who had known deceased for better than 60 years, testified to a conversation he had with deceased. He says:

"He started the conversation. He says, 'I was just going down to your place,' and I says, 'You can keep right on going,' and he says, 'No, it won't be necessary for me to go now.' He says, 'I want you to give me Tom Brace's address,' and I says, 'Yes,' and he says, 'What is it?' and I says, 'It is Salt Lake City, Utah. What do you want of Tom?' and he says, 'I want to write to him, you know about that property deal with Hawthorne and Tom,' and I says I heard of it. 'Well,' he says, 'that Tom has been back here and settled up that and tried to settle up with Robert,' and I says, 'Yes, Tom told me that he had been and he told me if he got what was coming to him that he would see I got what was coming to me, but I judged from that he didn't get it for I never saw what was coming to me,' and he says he and Mr. Hawthorne got into an argument over that—Jack and Hawthorne, and Jack ordered him off the place, or Hawthorne ordered Jack off the place because Mr. Dunn said that he might just as well put his hand into Mr. Brace's

pocket and stolen the money as to have taken it the way he did, and his sister then ordered him out of the house and he got up and left. Mrs. Hawthorne ordered him out of the house, and he said he had deeded his property to William and was going to live with William and William was going to give him a home for the rest of his days."

That his feeling towards his brother William, the defendant, was very different than towards the Hawthornes is clearly evidenced by the remark he made to a witness: "I deeded my farm to brother William. I can trust Will." Mrs. Mary Renshaw, at whose home deceased had boarded from 1905 to 1907 and who saw him and talked with him after the deed in question was executed, testified on direct-examination:

"He told me about having made deeds the last time he came from the Soldiers' Home, that was about a year before he died. That was the only time he ever told me about having made those deeds that I remember of. He said he gave his property to his brother Will, as he depended on him to look after him, after he got sick. He said he intended to live at his brother Will's and depended on him if he got sick, and couldn't take care of himself. This was after he came from the Soldiers' Home the last time. He didn't say anything as to how he had done it, but he said he thought it was so arranged so it would go where he see fit. I think his mind was all right. He spoke about the Hawthornes with reference to the Tom Brace matter."

On cross-examination the witness said: .

"Well, he said he was, he had a sick spell at the home, at the Soldiers' Home. And the last time the doctor said he was apt to have a stroke and he might go sudden, and for him not to be alone, that he might go sudden some time and he thought he would fix his property so it would go where he saw fit. He thought he had it fixed."

Another witness testified:

"He told me the year before he died when he come along he was going up to my brother's and he says— we got talking about something—and I says, 'Where

are you living,' and he says, 'I am living down to my brother Billie's,' and he says, 'I deeded him property,' and he says, 'and I have got a home to go to,' that is all he said about it."

The scrivener who drew the deed, a man 81 years old when he gave his testimony, had known Mr. Dunn from a boy, testified to his mental capacity; a doctor who had known him for 24 or 25 years and had treated him professionally, and neighbors and acquaintances express the view that he was mentally competent during all the years they had known him. That he drank to a greater or lesser degree, all admit. That he became intoxicated at times, no one questions. But that he was competent to manage and handle property, and had accumulated this 123 acres of land claimed by the plaintiffs to be now worth from $100 to $150 per acre notwithstanding his habits is, I think, clear.

I have referred to the feeling deceased had against some of his relatives, plaintiffs here. I think his feelings toward his brother William, or "Billy" as he sometimes called him was of a different sort. He never, so far as this record discloses, spoke an ill word of either of these defendants. When this deed was executed he was past 70 years old; he had been advised by his doctor that he was liable to an attack at any time, that he was liable to go. He needed a home. He needed care. The defendants gave him both. To compensate them and because of his preference for William over the others equally of kin he executed this deed. After the title by the deed in question was placed in William and his wife, the deceased continued to collect the rent and rented the farm as though it were his own. I do not think it should militate against William that he did not as soon as the title was placed in him and his wife, insist that the rent should be paid to him and oust his brother from any management of the farm he had owned many years. If Wil-

liam Dunn is the man I think this record discloses him to be I should not expect him to do differently than he did.

We do not think the facts of this case justify a decree setting aside this deed. See *Williams* v. *Williams*, 133 Mich. 21; *Pierce* v. *Pierce*, 38 Mich. 412; *Wright* v. *Fisher*, 65 Mich. 275; *Rice* v. *Rice*, 50 Mich. 448; *Behrns* v. *Qualman*, 147 Mich. 635; *Corby* v. *Moran*, 119 Mich. 272; *Russell* v. *Carpenter*, 153 Mich. 170; *Griffith* v. *Fuller*, 181 Mich. 553; *Case* v. *Bogart*, 188 Mich. 297; *Hayman* v. *Wakeham*, 133 Mich. 363; *Blackman* v. *Andrews*, 150 Mich. 322; *Hibbard* v. *Baker*, 141 Mich. 124; *Noble* v. *Hunter*, 195 Mich. 713.

Plaintiffs having failed to establish mental incapacity of decedent, and there being no claim of fraud or undue influence, and no trust relations being involved, we cannot inquire into the intent of the parties when the deed was delivered, a delivery in escrow to the grantee not being permitted. *Dyer* v. *Skadan*, 128 Mich. 348; *Wipfler* v. *Wipfler*, 153 Mich. 18 (16 L. R. A. [N. S.] 941).

In the deed from Catherine Hawthorne there was a mistake in the description of the premises. By the decree of the court below this mistake was corrected. Mrs. Hawthorne has not appealed so that this portion of the decree should be affirmed. As to the balance of the decree I think it should be reversed and one entered here dismissing the bill with costs of both courts to the defendants.

STEERE, BROOKE, STONE, CLARK, BIRD, and SHARPE, JJ., concurred with FELLOWS, J.

MOORE, C. J. I think the instant case is controlled by *Dyer* v. *Skadan*, 128 Mich. 348, and *Wipfler* v. *Wipfler*, 153 Mich. 18 (16 L. R. A. [N. S.] 941). For that reason I concur in the result reached by Justice FELLOWS.